UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In Re:

KEITH A YERIAN                                    CASE NO.: 6:15-bk-01720-KSJ

                                                  Chapter 7

    Debtor.

_____/                  6:15-ap-00064-KSJ

RICHARD B. WEBBER, II,
as Chapter 7 Trustee,

      Plaintiff,

v.

KEITH A. YERIAN
SUN Y. PAK,

      Defendants.

_____/

## PLAINTIFF/TRUSTEE'S SECOND SUPPLEMENTAL EXHIBIT LIST
### Trial Date: November 30, 2016

| Exh. # | Document Description | Date Identified | Date Admitted | With or Without Objection |
|---|---|---|---|---|
| 129 | Deposition Transcript of John McLeod dated May 16, 2016 | | | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the Plaintiff/Trustee's Exhibit 128 was disclosed to Frank M. Wolff, Esquire, Frank Martin Wolff, P.A., 19 E. Central Blvd., Orlando, FL 32801, on November 28, 2016.

        */s/ Bradley J. Anderson*

        _____

        Bradley J. Anderson, Esquire
        Florida Bar No.: 00105695
        ZIMMERMAN, KISER & SUTCLIFFE, P.A.

[11000-710/5763040/3]

315 E. Robinson St., Suite 600 (32801)
P.O. Box 3000
Orlando, FL  32802
Telephone:  (407) 425-7010
Facsimile:  (407) 425-2747
Counsel for Richard Blackstone Webber, II
Zimmerman, Kiser & Sutcliffe, P.A.
BAnderson@zkslawfirm.com
jconcannon@zkslawfirm.com
service@zkslawfirm.com

BJA/jbc
11000-710

Atkinson-Baker Court Reporters
www.depo.com

1                UNITED STATES BANKRUPTCY COURT

2                   MIDDLE DISTRICT OF FLORIDA

3                       ORLANDO DIVISION

4    IN RE:                        )
                                   )
5    KEITH A. YERIAN,              )
                                   )
6              Debtor.             )  Case No. 6:15-bk-01720-KSJ
     RICHARD B. WEBBER II, as Chapter  )
7    7 Trustee,                    )
                                   )
8              Plaintiff,          )
                                   )
9          vs.                     )  Case No. 6:15-AP-00064-KSJ
                                   )
10   KEITH A. YERIAN and SUN Y. PAK,  )
                                   )
11             Defendants.         )
                                   )
12   _____)

13

14

15                     DEPOSITION OF

16                     JOHN McLEOD

17                  GLENDALE, CALIFORNIA

18                     MAY 16, 2016

19

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com
23

24   REPORTED BY:  AMY PRATT, CSR NO. 8709

25   FILE NO.:  AA0470B

1

Atkinson-Baker Court Reporters
www.depo.com

```
 1                UNITED STATES BANKRUPTCY COURT

 2                  MIDDLE DISTRICT OF FLORIDA

 3                       ORLANDO DIVISION

 4   IN RE:                          )
                                     )
 5   KEITH A. YERIAN,                )
                                     )
 6               Debtor.             ) Case No. 6:15-bk-01720-KSJ
     RICHARD B. WEBBER II, as Chapter )
 7   7 Trustee,                      )
                                     )
 8               Plaintiff,          )
                                     )
 9          vs.                      ) Case No. 6:15-AP-00064-KSJ
                                     )
10   KEITH A. YERIAN and SUN Y. PAK, )
                                     )
11               Defendants.         )
                                     )
12   _____)

13

14

15          Deposition of JOHN MCLEOD, taken on

16   behalf of Plaintiff, at 500 North Brand Boulevard,

17   Third Floor, Glendale, California, commencing at

18   10:11 a.m., Monday, May 16, 2016, before Amy Pratt,

19   CSR No. 8709.

20

21

22

23

24

25
```

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1   APPEARANCES:

 2

 3      FOR PLAINTIFF CHAPTER 7 TRUSTEE:

 4           ZIMMERMAN, KISER & SUTCLIFFE, P.A.
             BY:  BRADLEY J. ANDERSON, ESQUIRE
 5           315 East Robinson Street
             Suite 600 - Landmark Center One
 6           Orlando, Florida  32801
             407.425.7010
 7           (Present Telephonically)

 8

 9      FOR DEFENDANTS:

10           WOLFF, HILL, MCFARLIN & HERRON, P.A.
             BY:  FRANK M. WOLFF, ESQUIRE
11           1851 West Colonial Drive
             Suite 200
12           Orlando, Florida  32804
             407.648.0058
13           (Present Telephonically)

14

15

16

17

18
        ALSO PRESENT:  Keith Yerian (Via telephone)
19                      Sun Y. Pak (Via telephone)
                        Richard B. Webber (Via telephone)
20

21

22

23

24

25
```

3

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    I N D E X

 2     EXAMINATION                                    PAGE

 3         By Mr. Anderson                              6

 4

 5

 6            E X H I B I T S (Bound Separately)

 7     (Exhibits 21, 27, 32, and 38 are not attached.)

 8   TRUSTEE'S                                         PAGE

 9       1   Articles of Organization, Mwagusi Software   18
             LLC (4 pages)
10
         2   Payroll Journal (1 page)                     29
11
         3   Check to Yerian from Mwagusi Software        30
12           (1 page)

13       4   Schedule K-1, 2011 (1 page)                  31

14       5   Expense Statement (1 page)                   32

15       6   Credit card statements (16 pages)            39

16       7   Bank statements, account ending 281          42
             (54 pages)
17
         8   Tax Return, 2011 (14 pages)                  54
18
         9   Payroll Journal (1 page)                     57
19
        10   Email to McLeod from Yerian, 5/16/12 with    59
20           attachments (3 pages)

21      11   Photocopied check, 5/21/12 (1 page)          62

22      12   Photocopied check, 8/14/12 (1 page)          63

23      13   Job Invoice (3 pages)                        66

24      14   Invoices, 2012 (4 pages)                     70

25      15   Chase payment (1 page)                       72
```

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

I N D E X (Continued)


E X H I B I T S

TRUSTEE'S                                                    PAGE

16   Tax return 2012 (14 pages)                             73

17   W-2, 2012 (1 page)                                     78

18   Credit card statements (20 pages)                      79

19   Credit card statements (34 pages)                      84

20   Bank statements (50 pages)                             89

22   Tax Return, 2013 (11 pages)                            97

23   Notice of Benefits Paid and Charges to                 100
     Employer (2 pages)

24   Travel Expense Reports (9 pages)                       103

25   Credit card statements (48 pages)                      107

26   Bank statements (50 pages)                             115

28   Settlement Agreement and General Release               124
     (3 pages)

29   Tax Return, 2014 (10 pages)                            127

30   Credit card statements (48 pages)                      131

31   Bank statements (48 pages)                             138

33   Photocopied checks (67 pages)                          140

34   Tax Return, 2015 (9 pages)                             149

35   Email from Yerian to McLeod, 12/18/15                  151
     (1 page)

36   Credit card statements (44 pages)                      152

37   Bank statements (40 pages)                             155

5

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1                        JOHN MCLEOD,
 2     having declared under penalty of perjury to tell
 3      the truth, was examined and testified as follows:
 4
 5                        EXAMINATION
 6  BY MR. ANDERSON:
 7      Q.   All right.  Good afternoon, Mr. McLeod.  My
 8  name is Bradley Anderson.  I represent Chapter 7 Trustee
 9  Richard Webber in a pending bankruptcy case filed by
10  Keith Yerian.
11           Have you had your deposition taken previously?
12      A.   Not in this case.
13      Q.   Have you ever had your deposition taken
14  previously?
15      A.   In a previous case up in Ohio.
16      Q.   Okay.  Actually, I should have said this
17  earlier.  Can you please state your full name for the
18  record and spell your last name.
19      A.   John McLeod, M-c-L-e-o-d.
20      Q.   Since you've had your deposition taken
21  previously, I won't go into my whole normal spiel, but
22  I'll give you some brief ground rules so we can get
23  through this as quickly as possible.
24           I'm just here to find out some information
25  regarding Mr. Yerian's bankruptcy.  If you don't
```

6

John McLeod
May 16, 2016

1  understand a question that I ask, please ask me to

2  rephrase or repeat it.  Please don't guess.  If you

3  don't know the answer to something, please feel free to

4  say, "I don't know."  But otherwise, if you do answer a

5  question, I'll assume that you understood it.

6         The court reporter here is -- or on your side

7  of the line is transcribing everything that we're

8  saying.  So please let me finish my questions completely

9  before you answer.  I will let you answer completely

10 before starting my next question.  And please give

11 audible answers such as "yes" or "no" instead of

12 "uh-huh," "unh-unh," things like that.

13        Just remember you're testifying under oath here

14 today and you have an obligation to respond completely

15 and accurately to all of my questions.

16        If at any time you need to take a break, just

17 let me know.  We'll take a break.

18        Do you understand the procedure as I have

19 explained it to you?

20    A.   Yes.

21    Q.   Okay.  Do you have in front of you a binder

22 that we sent to the court reporter's office with tabs 1

23 through 38?

24    A.   Yes.

25    Q.   I will refer to separate tabs, and then you'll

7

```
 1   notice at the bottom of the pages there's also a
 2   separate number which is referred to as Bates Numbers.
 3   I'll refer to those as well throughout the deposition.
 4   If you're ready, we'll get started.
 5           What is your date of birth, sir?
 6      A.   December 4th, 1941.
 7      Q.   What is your current home address?
 8      A.   3845 Cedarbend Drive, La Crescenta, California
 9   91214.
10      Q.   What is your current place of employment?
11      A.   Mwagusi Software LLC.
12      Q.   What is the address for that company?
13      A.   That is the same as my home address.
14      Q.   Okay.  What is your educational background?
15      A.   I have a Master's degree in physics.
16      Q.   Do you have a bachelor's?
17      A.   Yes.  In physics also.
18      Q.   What institutions were those degrees from?
19      A.   My undergraduate degree is from University of
20   Notre Dame, and the graduate degree is from Texas
21   Christian University.
22      Q.   All right.  Before Mwagusi Software, what type
23   of employment did you have immediately preceding that?
24      A.   I was employed as a consultant for a company in
25   Wisconsin.
```

8

Atkinson-Baker Court Reporters
www.depo.com

1       Q.   What's the name of that company?

2       A.   Information Pages.

3       Q.   What type of work at Information Pages -- did

4  you do for Information Pages?

5       A.   I was helping them set up a national Yellow

6  Page system.

7       Q.   Did that involve any type of computer

8  programming or coding?

9       A.   Yes.

10      Q.   Before Information Pages, then what was the job

11  you had immediately preceding that?

12      A.   I was working for a company called YP Exchange,

13  Yellow Pages Exchange.

14      Q.   What type of work did you do for YP Exchange?

15      A.   Setting up a national Yellow Pages system.

16      Q.   Okay.  And what does setting up a national

17  Yellow Pages system entail?

18      A.   It's taking a database of businesses and

19  breaking them down by location and type of business into

20  the categories you would typically see in a Yellow Page

21  phone directory.

22      Q.   Was your job to put those into a website, a

23  computer program?

24      A.   I was feeding them into a database.

25      Q.   And then how would that information be

9

1  accessed?

2      A.    That would be accessed through a website, and

3  there was another programmer who provided the website.

4      Q.    Before then, prior to YP Exchange, what was

5  your prior place of employment before that?

6      A.    That was a company called Yellow Page City in

7  Rochester, New York.

8      Q.    Let me take a step back.  When did you work for

9  Information Pages?  What years?

10     A.    Okay.  I worked -- I was a founder originally

11 of Information Pages in 1999, and I worked there until

12 about 2003.  And then I worked for them as a contract

13 work in 2009 and '10.

14     Q.    Okay.  So but then did you work for YP Exchange

15 between 2003 and 2009?

16     A.    I worked for YP Exchange between 2007, 2008,

17 somewhere in that time range.

18     Q.    All right.  What about YP City -- YP City?

19 Yellow Pages City, when did you work for them?

20     A.    From 2004 to 2007 roughly.

21     Q.    What type of work was that?  What type of work

22 did you do for YP City?

23     A.    I was the chief financial officer, and I helped

24 them set up a national Yellow Page database.

25     Q.    Do you know Mr. Keith Yerian?

10

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1        A.    Yes.

2        Q.    How do you know Mr. Yerian?

3        A.    He's my employee.

4        Q.    When did you first meet him?

5        A.    I think I recall I met him at a Yellow Pages

6    convention back in about 2002 or '3, somewhere in that

7    time frame.  I met him very briefly at that convention

8    by the way.

9        Q.    Okay.  So after you met him briefly at that

10   convention, when was the next chance that you had to

11   either speak with him or run into him?

12       A.    When I was working for Yellow Pages Exchange,

13   we needed some additional programming help, and I needed

14   someone who understood the Yellow Pages business, and I

15   remembered that Keith had developed a Yellow Page

16   application, and so I dug through my records and gave

17   him a call.

18       Q.    When about would this have been?  What time

19   period?

20       A.    This would have been -- it may have been late

21   2007 or early 2008.

22       Q.    So you hadn't talked to him for a period of

23   five years but wanted to give him a call when you

24   needed --

25       A.    Right, right.  I just had remembered -- I was

11

1  looking for a programmer who had knowledge of the Yellow

2  Pages business, and I tried several other people, and

3  they hadn't worked out.  So and then I happened to

4  remember that I met this guy at this Yellow Page

5  convention who had developed a Yellow Page system on a

6  memory stick.

7      Q.   So at YP Exchange then, what type of role did

8  Mr. Yerian hold?

9      A.   He was helping do programming for developing a

10  national Yellow Page system.

11     Q.   And when would he have started this, doing that

12  programming work?

13     A.   Like I said, that would have been approximately

14  late 2007, maybe early 2008.  I don't remember exactly.

15     Q.   How long did Mr. Yerian work with you at YP

16  Exchange?

17     A.   We both worked there until October 2008 when

18  the big financial crash came, and the individual who was

19  funding that effort got severely financially damaged and

20  stopped funding it.

21     Q.   All right.  So you were both laid off from that

22  company in October of 2008?

23     A.   Yes.

24     Q.   After that, when was the next opportunity that

25  you had to interact or spend time with Mr. Yerian?

12

Atkinson-Baker Court Reporters
www.depo.com

```
 1      A.   I think I had a couple of phone calls with him

 2  over the next year, just -- I felt kind of bad because I

 3  had gotten him involved in the Yellow Pages Exchange

 4  thing and then it all fell apart.  And we -- we

 5  discussed a couple of times other business ventures that

 6  we might get into, but we never came up with anything

 7  that worked.

 8      Q.   Did Mr. Yerian relocate as part of his -- you

 9  know, you bringing him onto this YP Exchange?

10      A.   No.  No.  He remained working out of his -- out

11  of his home in Ohio, I guess.

12      Q.   Okay.  So after then the phone calls during

13  2009, when was the next chance that you would have had

14  to work with him?

15      A.   As I recall, it was maybe September of 2010.

16  He called me and said that he had an individual who

17  wanted an independent evaluation of a website that I

18  guess Keith had developed.  And so he put me in contact

19  with that individual, and I did an evaluation of the

20  website, and that was the end of that.  But so that was

21  the interaction --

22      Q.   So --

23      A.   -- I had with Keith at that point.

24      Q.   All right.  I didn't mean to cut you off.  What

25  was the name of the individual?
```

1     A.    John Martin.

2     Q.    What website -- what was the name of the

3   website or what -- give me some information about the

4   website that you were --

5     A.    It was a company called First Watch.

6     Q.    And what were you supposed to do for First

7   Watch?

8     A.    I was just to look at their website and make

9   sure that everything worked, when you clicked the

10  buttons, it went where it should and stuff like that.   I

11  didn't do any of the technical work or the business

12  evaluation of it.

13    Q.    So after the website that you audited or

14  reviewed in September of 2010, when was the next

15  opportunity that you would have had interaction either

16  professional or business with -- I'm sorry -- either

17  professional or personal with Mr. Yerian?

18    A.    At some point in there Keith called me and

19  asked me if I wanted to share a house in Puerto Rico

20  that he wanted to rent as -- when we had worked together

21  in 2007, he talked about the fact that he liked to spend

22  the winter in Puerto Rico.  So he was looking to rent a

23  house in Puerto Rico, and he went looking for someone

24  else to help share the cost.  And so he called me and

25  one of his other friends, a guy named Bob Messner, and

Atkinson-Baker Court Reporters
www.depo.com

1  we arranged to rent this house and share the cost down

2  in Puerto Rico in January 2010, I believe.

3      Q.    So then that would have been prior to you

4  having done the audit?

5      A.    Oh, I'm sorry.  Just a minute.  That was after.

6  That was after.

7      Q.    So it had to have been January of 2011?

8      A.    Yes.  Yeah.  That's correct.

9      Q.    Okay.  So you, Keith Yerian, and Bob Messner

10  rented a house in Puerto Rico during January of 2011?

11      A.    That's my recollection.

12      Q.    And that was a vacation type trip?

13      A.    Yes.

14      Q.    Did each party pay their own expenses as part

15  of going on that trip?

16      A.    Yes.

17      Q.    Okay.  So after the Puerto Rico trip, when

18  would have been the next opportunity that you would have

19  to have personal or professional interaction with

20  Mr. Yerian?

21      A.    Well, as a -- sometime in the last quarter of

22  the previous year, Keith had -- I don't know what

23  exactly happened, but anyway, a company called CMS had

24  work that they needed done, and it was more than Keith

25  could do, and so he asked me if I wanted to be involved.

15

Atkinson-Baker Court Reporters
www.depo.com

1   And I'm getting my years mixed up now.  I've got to

2   think about this.

3       Q.   Let's backtrack.  So the time frame I had was

4   September of 2010 was when you did the audit of the

5   website for John Martin.  And in January of 2011 was the

6   trip to Puerto Rico.  So did your involvement with this

7   company CMS -- was that after that Puerto Rico trip in

8   January 2011?

9       A.   It started during that trip.  We started --

10  okay.  I think I've got my year wrong.  I think that I'm

11  off by a year.  It's 2009 when I did the website

12  evaluation for First Watch, I think.  And in 2010, we

13  rented the house -- January 2010 we rented the house in

14  Puerto Rico with Bob Messner.  And then I didn't hear

15  from Keith again until the last quarter of 2010, and

16  that was when he raised the subject of this work for

17  CMS.  And so then we made another trip to Puerto Rico in

18  January 2011, and at that point we -- on that trip, we

19  discussed the work for CMS.

20      Q.   Who went on the trip in January 2011, the

21  second trip?

22      A.   Let me think here.  I think it was just Keith

23  and myself and our wives, and my recollection is that

24  Keith stayed down there longer than I did.  He wanted to

25  spend more time down there.  And I think maybe other

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  people came down to visit, but they weren't involved in

2  the business issues.

3      Q.   Okay.  So after that trip then in January of

4  2011, the second trip, when would have been your next

5  professional or personal interaction with him?

6      A.   After that, Keith and I began -- or during that

7  time, we began working on the CMS project, and we worked

8  on that for two or three years thereafter.

9      Q.   What did the CMS project entail?

10     A.   They had a website, and they needed

11 modifications made to it to kind of bring it up to be

12 competitive with some of the other people in their

13 industry.

14     Q.   So were you and Keith doing, you know,

15 individual -- or I guess I'm trying to think of -- like

16 independent contracting work for CMS during this period?

17     A.   We -- well, in January when we were down in

18 Puerto Rico, I decided to form a company, which is

19 Mwagusi Software.  And so we were working for CMS, and

20 CMS was paying Mwagusi, but it was kind of erratic and

21 irregular to begin with.  And so that was what we were

22 doing, and I don't know what else you want to know about

23 it.

24     Q.   Okay.  Let me start to -- actually, let me

25 get -- before I turn to the exhibits, let me ask you.

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1   Have you met Mr. Yerian's wife, Sun Yo Pak?

2       A.   Yes.

3       Q.   When did you first have a chance to meet her?

4       A.   In the trip to Puerto Rico in 2010.

5       Q.   That was the first trip?

6       A.   Yes.

7            MR. ANDERSON:   Okay.   Now, let me turn in the

8   binder if I could have the court reporter please mark

9   tab 1 as Exhibit 1, which is Bates labeled Mwagusi 727

10  to 730 for the record.

11           (Trustee's Exhibit 1 was marked

12       for identification.)

13  BY MR. ANDERSON:

14      Q.   Do you recognize what's been marked as

15  Exhibit 1?

16      A.   Yes.

17      Q.   And what do you recognize Exhibit 1 to be?

18      A.   It's Articles of Organization for

19  Limited-Liability Company.

20      Q.   Is this the Articles of Organization that you

21  would have completed to form Mwagusi Software?

22      A.   This was what I submitted to a company in Las

23  Vegas that sets up LLCs -- or I'm sorry.

24      Q.   Is that the name of that company, GG

25  International?

18

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    A.   Not that I know of.  I thought it was something

2 like something to do with LLC's or something, and it was

3 in the name of the company.  I don't remember offhand.

4    Q.   Okay.  So if you look in the middle of the

5 page --

6    A.   Oh, yeah.  Maybe their official corporate name

7 is GG International.  I didn't know that.

8    Q.   Okay.  So in paragraph 4, you selected or it

9 identified that there are two managers identified as

10 John McLeod and Keith Yerian.  Are those, in fact, the

11 two managers -- were those, in fact, the two managers of

12 Mwagusi Software when the company was formed?

13    A.   No.  When I decided to form the company, I

14 didn't -- I decided to do it, and I went ahead and did

15 it on the assumption that Keith would want to be

16 involved in it as a manager.  But after I got that done,

17 Keith said he did not want to be in that position.  So

18 he never became a manager of the company.  He never

19 signed on.

20    Q.   You're looking at Articles of Organization

21 here, Exhibit 1, which would you agree with me that

22 paragraph 5 says the two managers are John McLeod and

23 Keith Yerian?

24    A.   Yes.

25    Q.   Okay.  Did you ever make any kind of an

19

John McLeod
May 16, 2016

1  amendment or do anything that would have removed

2  Mr. Yerian as a manager of this company?

3      A.   After Mr. Yerian said that he didn't want to be

4  involved, I called the Las Vegas company and asked them

5  to amend the filing, and they said they did.

6      Q.   Do you know when about that date was that you

7  would have called to ask them to do that?

8      A.   It would have been -- let's see.  The company

9  was organized in February.  It would have been in March

10 probably.

11     Q.   March of 2011?

12     A.   Yeah.

13     Q.   Let me ask you about that conversation about

14 where you referenced that he didn't want to be a part of

15 the company.  Did he approach you to request that he not

16 be a part of the company?

17     A.   No.  I sent him some documents to sign, and he

18 said, "No.  I don't want to be -- I only want to be an

19 employee and do coding."

20     Q.   Did he tell you why he didn't want to have any

21 management interest in this company?

22     A.   Not specifically other than to say he liked

23 coding and he didn't like managing companies.

24     Q.   At the time that this company was formed, was

25 CMS your only customer?

20

1    A.    There was one other company named Direct Floral

2 or something like that.  I forget the name now.

3    Q.    Had you ever heard of the company CMS before

4 Mr. Yerian had identified them as someone that he was

5 doing work for on your Puerto Rico trip?

6    A.    No.

7    Q.    So it was Mr. Yerian that introduced CMS to you

8 and to Mwagusi Software?

9    A.    Yes.

10    Q.    And to the best of your knowledge, you said

11 that you have had Mr. Yerian removed as a manager of

12 Mwagusi?

13    A.    Yes.

14    Q.    Have you ever seen any document or received any

15 kind of a confirmation that he was, in fact, removed as

16 a manager?

17         MR. WOLFF:  Object to the form of the question.

18         You can answer.

19 BY MR. ANDERSON:

20    Q.    Do you need me to repeat it?

21    A.    No.  I do not recall receiving any such

22 documents.

23    Q.    Okay.  If you could please turn to page 2 of

24 that document, the Bates number is MS 728.

25    A.    Uh-huh.

21

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1     Q.    Do you see the middle of the page where it has

2   the address 7260 West Azure Drive?

3     A.    Yes.

4     Q.    Whose address is that?

5     A.    That's the address of this GG International.

6     Q.    Can you tell me what the name Mwagusi Software

7   means?  Or what does Mwagusi mean?

8     A.    Mwagusi is the name of a safari camp in Africa.

9     Q.    Any particular reason why you would have chosen

10   that as the name of your software company?

11     A.    I happened to go there back in 2007, and when I

12   was looking for a name for the company, I wanted

13   something unusual, and that seemed to fit the bill.

14     Q.    That's fair enough.  When you started Mwagusi

15   Software, what type of services was the company to

16   provide?

17     A.    Software development.  I guess that's the best

18   description, software development.

19     Q.    When the company was started, you had two

20   customers, I think you testified to, CMS and Direct

21   Floral; is that correct?

22     A.    Yes.  I think so.

23     Q.    Did you and Mr. Yerian discuss any plans as to

24   developing additional business?

25     A.    Not at that particular point because there was

1   so much work to be done for CMS that it looked like it

2   would take us a year or two to get it all done.

3       Q.   When the company was formed, did you make an

4   initial contribution or, you know, capital investment to

5   get the company off the ground?

6       A.   Yeah.  I think I put like $500 into the bank

7   account to get it started, and I think I paid for the

8   organization of the company by the GG International.

9       Q.   Did Mr. Yerian put in any money towards this --

10  I guess I would call it an initial capital investment to

11  get the company off the ground?

12      A.   No.

13      Q.   When the company was started, what percentage

14  did you own?

15      A.   100 percent.

16      Q.   When the company was formed and you were going

17  to be receiving money from CMS, what was the

18  understanding between you and Mr. Yerian as to how

19  profits would be distributed?

20      A.   There was no understanding.  I would pay him --

21  we had expenses to cover.  So after the expenses were

22  paid, I would pay myself and pay him for what we did

23  initially.  And then towards the end of 2011, I set up a

24  payroll, and we discussed with Dean Barker, the owner of

25  CMS, the fact that we needed to have a regular income in

23

John McLeod
May 16, 2016

1  order to maintain the payroll, and I decided that I

2  would put Keith and myself -- make Keith and myself

3  available to CMS half time because we did want to have

4  other -- the rest of the time available to look for

5  other work; so that's what I did.

6      Q.   So how were you keeping track of which amount

7  of work that you would have done for CMS versus

8  Mr. Yerian at that time?

9      A.   It was more or less an honor system.  I was in

10 California, and he was in Ohio.  So we couldn't look

11 over each other's shoulder.

12     Q.   So you were taking each other at your word

13 about the amount of work you were doing and then profits

14 would be distributed on some type of a pro rata basis

15 depending on how much work each of you had said you were

16 providing?

17     A.   No.  The profits all went to me.  Keith would

18 only get his salary.

19     Q.   Okay.  In 2011 then what was Keith's salary?

20     A.   It came out to be $24,000.

21     Q.   How was that salary determined?

22     A.   Okay.  Until I got the payroll set up and we

23 had a regular enough income to maintain the payroll, I

24 had advanced Keith money to -- some to pay his bills,

25 et cetera.  So once I got the payroll set up, I figured

24

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  out how much he had been advanced and how much the

2  payroll -- the equivalent payroll would be, and I told

3  Paychex who did the payroll to issue a check to him for

4  $24,000 but to not -- not to -- to issue a W-2 for him

5  of $24,000, but not to actually pay him any money

6  because that money was offset against the advances that

7  had been made.

8      Q.   Okay.  So let me go back then.  So the advances

9  would have been made when?

10     A.   During 2011.

11     Q.   And what were they for?

12     A.   There was some where he had bills that had to

13 be paid, and I got them paid.  Or sometimes I wrote a

14 check to -- as I recall, I wrote a check to -- I'm not

15 sure -- some bank that he owed some money to, and there

16 was sometimes I believe I wrote him a check directly,

17 but I don't remember the exact amounts.

18     Q.   When you said earlier that you would write a

19 check, was that off the Mwagusi Software account, or is

20 that you personally?

21     A.   That was --

22     Q.   Just to clarify, when you said you were

23 advancing him funds, is that out of the company or out

24 of your pocket?

25     A.    I think very initially, I advanced some funds

25

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  out of my pocket, but after we got money -- some money

2  coming in from Mwagusi, I paid it out of Mwagusi as I

3  recall.

4      Q.   Did you ever have experience running a company

5  before?

6      A.   Yes.

7      Q.   When did you do that previously?  I'm sorry.

8  You talked about earlier you were the CFO of -- what is

9  it? -- YP Pages?

10     A.   Yellow Page City, yeah.

11     Q.   Okay.  Why did you choose to form Mwagusi in

12 Nevada versus California which I think you testified

13 earlier is where you live?

14     A.    Well, I was under the impression that -- well,

15 I guess it would be true that if you -- that first of

16 all there was a lot less hassle associated with doing it

17 in Nevada, and there was a lot less costs.  And so that

18 was where I decided to set it up because it was

19 relatively easy to do.  You make a phone call and, you

20 know, pay them, and they take care of everything for

21 you.

22     Q.   All right.  So I'd like to ask you now to

23 switch gears a little bit and talk about Mr. Yerian's

24 employment with Mwagusi Software.  Do you know the exact

25 date when he started or approximate?

26

Atkinson-Baker Court Reporters
www.depo.com

1      A.   Well, he would have started really in January

2   of 2011 when we started talking about the CMS project.

3      Q.   And what would his job title have been at that

4   point?

5      A.   It would probably have been something like

6   Senior Software Engineer.

7      Q.   Would that have been his title, you know,

8   through current date?

9      A.   Yeah.

10      Q.   Okay.  So when he started in 2011, what were

11   the terms of his employment as far as salary, benefits,

12   those types of items?

13      A.   There was nothing written on that, and there

14   was -- the agreement was that as we got CMS up and

15   running, we would get -- eventually get a payroll set up

16   or I would get a payroll set up, and in the meantime I

17   would advance him some money to cover bills that he had

18   to pay.

19      Q.   And that would have been coming out of the

20   money that was coming in from CMS?

21      A.   Yes.  And there was some money I believe that

22   came in from Direct Floral.

23      Q.   Okay.  Other than the initial $500 that you

24   personally put in, did you put any other money into the

25   company?

27

John McLeod
May 16, 2016

1    A.    Not at that point in time, no.

2    Q.    How about prior -- prior to making these

3 advances, would you have put any money into the company

4 at that point?

5    A.    No.

6    Q.    All right.  So the advances then to Keith

7 Yerian were strictly from income related to CMS and

8 Direct Floral?

9    A.    Right.

10    Q.    Okay.  How did you secure Direct Floral as a

11 customer?

12    A.    Keith referred them to me, and they had work

13 that needed to be done, and he couldn't do it.  So he

14 referred them to me.

15    Q.    What type of work would that have been?

16    A.    It was modifying their website.

17    Q.    So is it fair to say that your specialty is

18 more in website development and Keith Yerian's is more

19 in computer programming and software development?

20    A.    No.  They're pretty much all the same thing.

21    Q.    So you and Keith can do most of the same things

22 with each of you having a specialty.  This would have

23 been -- modifying their website would have been more of

24 your specialty?

25    A.    Well, it was just something that I could do and

28

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1   was -- assigned myself to do it so to speak.

2       Q.   All right.  So other than the -- were there any

3   benefits that were to be received during 2011, say, you

4   know, health care?

5       A.   Health insurance was -- we paid health

6   insurance as some of our expense.

7       Q.   So for 2011 then, Keith Yerian received a

8   $24,000 salary advance and health insurance?

9       A.   Yes.

10      Q.   Any other expenses or benefits?

11      A.   Not that I can recall.

12           MR. ANDERSON:  Okay.  Let me go ahead and --

13   Madam Court Reporter, if you could mark tab 2 as

14   Exhibit 2.

15           (Trustee's Exhibit 2 was marked

16       for identification.)

17   BY MR. ANDERSON:

18      Q.   All right.  So Mr. McLeod, do you have

19   Exhibit 2 in front of you marked MS No. 1 as the Bates

20   stamp?

21      A.   Uh-huh.  Yes.

22      Q.   Okay.  What do you recognize Trustee's

23   Exhibit 2 to be?

24      A.   It's a Payroll Journal.

25      Q.   Okay.  And is it the Payroll Journal from 2011

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

 1  that shows that Mr. Yerian would have received $24,000?

 2      A.   Yes.

 3      Q.   Okay.  So instead of $24,000 identified as

 4  earnings, would be that W-2 income, or is that the

 5  expense advancement?

 6      A.   No.   That's W-2 income.

 7      Q.   And you also received $24,000 during 2011?

 8      A.   Yes.

 9      Q.   And would that money have been related to

10  income that you would have received from Direct Floral

11  and CMS?

12      A.   Yes.

13          MR. ANDERSON:  Okay.  If I could have the court

14  reporter mark Exhibit 3, please, tab 3.

15          (Trustee's Exhibit 3 was marked

16      for identification.)

17  BY MR. ANDERSON:

18      Q.   Mr. McLeod, do you have Trustee's Exhibit 3 in

19  front of you?

20      A.   Yes.

21      Q.   Which is Mwagusi Software Bates stamp 16?

22      A.   Yes.

23      Q.   What do you recognize the Trustee's Exhibit 3

24  to be?

25      A.   It's a non-negotiable check stub or check.

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1     Q.   Is this the check stub that would reference the

2   $24,000 W-2 advance that Mr. Yerian received in 2011?

3     A.   Yes.

4     Q.   Did you pay out at the end of 2011 most of the

5   income that was being held or most of the earnings that

6   were being held by Mwagusi at that time?

7     A.   Yes.

8     Q.   Did you also get a check in the same amount --

9     A.   Yes.

10    Q.   -- $21,157.84?

11    A.   I received a check for something like that

12   amount.  His check and mine would not have been exactly

13   the same.

14    Q.   Is that for tax reasons?  Is that why they

15   would have been different?

16    A.   Yes.  I pay California taxes.  He would have

17   been paying, I guess, Ohio tax.

18         MR. ANDERSON:  Okay.  If I could have the court

19   reporter mark tab 4 as the Trustee's Exhibit 4, please,

20   which is Mwagusi Software Bates No. 84.

21         (Trustee's Exhibit 4 was marked

22     for identification.)

23   BY MR. ANDERSON:

24    Q.   Mr. McLeod, do you have Trustee's Exhibit 4 in

25   front of you?

31

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1      A.   Yes.

 2      Q.   And what do you recognize Trustee's Exhibit 4

 3 to be?

 4      A.   Expense Statement.

 5      Q.   Okay.  I think you might be on the wrong tab.

 6      A.   Maybe I am.  Okay.  Yeah.  I went too far.

 7      Q.   Okay.  So do we have Mwagusi Software?

 8      A.   Yes.  This is schedule K-1.

 9      Q.   Was this the K-1 that you received in 2011?

10      A.   Yes.

11      Q.   It references that you own 100 percent of the

12 stock ownership for that year; is that accurate?

13      A.   Yes.

14      Q.   Has anyone other than you received a K-1 from

15 Mwagusi Software?

16      A.   No.

17           MR. ANDERSON:  If I could have tab 5 marked as

18 Trustee's Exhibit 5, please, Mwagusi Software Bates No.

19 139.

20           (Trustee's Exhibit 5 was marked

21      for identification.)

22 BY MR. ANDERSON:

23      Q.   Mr. McLeod, do you have Trustee's Exhibit 5 in

24 front of you?

25      A.   Yes.  Expense Statement.
```

32

John McLeod
May 16, 2016

 1     Q.   Is this an Expense Statement that Mr. Yerian

 2   would have submitted to you for his expenses during

 3   2011?

 4     A.   Yes.

 5     Q.   Okay.  I'm going to start at the top.  "163

 6   Trips to CMS."  Do you see where I'm referencing?

 7     A.   Yes.

 8     Q.   What did Mr. Yerian tell you about making 163

 9   trips to CMS?

10     A.   Well, he was traveling from his home to CMS on

11   basically a daily basis, and this is mileage expense.

12     Q.   And was it necessary for him to be at CMS's

13   location to do the work that he was doing?

14     A.   Yes.  We were in the process of training some

15   additional potential employees for CMS.

16     Q.   What were the names of those employees?

17     A.   Brian Havran and Dakota Kincer and one other

18   individual.  We hired -- not we.  I shouldn't say we.

19   Mwagusi brought on these three students as contract

20   employees during the summer with the intent to evaluate

21   them for CMS and decide which one CMS would hire.  And

22   so we did that.

23          And then when we set up the payroll, Brian

24   Havran was hired by CMS, and after talking with Dean

25   Barker, the owner of CMS, I decided to hire Dakota

John McLeod
May 16, 2016

1    Kincer as a Mwagusi employee who would be assigned full

2    time to work at CMS.

3        Q.    Okay.  Let's go to the next line item, "2 Trips

4    to Pegasus."  Who is Pegasus?

5        A.    Pegasus is a customer -- they weren't a

6    customer at that time.  They were a potential customer,

7    and they later became a customer, but Keith made two

8    trips down to Pegasus in -- there in Georgia, from Ohio

9    to Georgia, and that was his mileage for those trips.

10       Q.    Okay.  What about the next line down, "To/From

11   Other Customers & CAK"?  What is that in reference to?

12       A.    That is in reference to talking with other

13   potential customers in the Cleveland, Ohio area and to

14   trips to the Akron airport to I think pick me up when I

15   flew in to meet with CMS.

16       Q.    Is CAK the airport code for Akron, Ohio?

17       A.    Yes.

18       Q.    Okay.  So --

19       A.    Yeah.  Right.  Right.

20       Q.    That is the airport code for Akron, Ohio, CAK?

21       A.    Yes.  Yes.

22       Q.    Okay.  So let me skip to the bottom because

23   they're going in reverse chronological order.  So

24   "1/15/2011 Airfare SJU/CAK $286," what was that for?

25       A.    That was for Keith to fly down to Puerto Rico

34

Atkinson-Baker Court Reporters
www.depo.com

1  for the meeting that we had down there.

2      Q.   This was the meeting in which you were

3  determining whether or not to start Mwagusi Software?

4      A.   Right.

5      Q.   So this is an expense that was incurred before

6  Mwagusi was, in fact, a company?

7      A.   Yes.

8      Q.   All right.  So I'm going to skip up to line

9  "Airfare SJU/CAK" going in chronological order

10 October 15, two thousand -- actually, I'm sorry.  Let me

11 withdraw that.

12          Skipping up three lines, February 15, 2011 --

13 so that's exactly one month later -- there's another

14 charge for "Airfare SJU/CAK."  What is that expense for?

15     A.   As I recall, that was -- that was possibly the

16 airfare for -- it's either for Keith to return from

17 Puerto Rico.  That's what I suspect it is, but I don't

18 know offhand.

19     Q.   Okay.  So skipping down another line, there's

20 another Puerto Rican airfare charge on October 15, 2011

21 for $402.  What would that be for?

22     A.   At some point there, Keith had gone down to

23 Puerto Rico and was staying down there, and he needed to

24 fly back to Ohio, to Akron, to meet with CMS.  I believe

25 that's what that was for.

35

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      Q.   Was he down in Puerto Rico for vacation during

2   that period?

3      A.   I know for a fact that he wanted to live down

4   there.  When I went down in January 2011, he wanted to

5   stay longer, and I believe he did, but that was on, you

6   know, his own expense, not company expense.

7      Q.   So if I understand you correctly, Mr. Yerian

8   was on vacation, and he needed --

9      A.   No, no.  He was not on vacation.  He was

10  basically temporarily living down in Puerto Rico.

11     Q.   And was he working for Mwagusi Software during

12  that time when he was temporarily living in Puerto Rico?

13     A.   Yes.

14     Q.   All right.  So then there's one more that we

15  haven't addressed which is 11/15/2011.

16     A.   My recollection is that he flew back to meet

17  again with CMS.

18     Q.   So he was in Puerto Rico again, and he needed

19  to go visit a customer.  So he expensed his airfare for

20  his return trip?

21     A.   Right.  And I've got to emphasize that I'm not

22  100 percent certain of that, but I know that he did make

23  some trips.

24     Q.   The statement that Mr. Yerian was in Puerto

25  Rico and he needed to return home, would you have

1 allowed him to expense that flight?

2     A.    Well, you know, if he had returned home, it

3 would have been probably to meet with CMS or some other

4 potential customer.  The company would not have paid for

5 just him to galavant around the country and wherever he

6 wanted to go.

7     Q.    But it was because he was returning to the U.S.

8 for the specific intent of meeting with a client you

9 allowed him to expense that airfare?

10     A.    Yes.  I don't recall him ever making a trip for

11 what I'll call solely personal reasons.  I mean he may

12 have done it, but he didn't submit that to the company.

13     Q.    All right.  I'd like to switch gears a little

14 bit.  I'd like to ask you some questions about the

15 credit card policy of Mwagusi Software.  Did you have a

16 formal policy about who could use credit cards and for

17 what expenses?

18     A.    Not a written policy, no.

19     Q.    Okay.  So when the company was first started in

20 2011, who had a credit card linked to a Mwagusi Software

21 account?

22     A.    I had one initially, and then I gave one later

23 to Keith.

24     Q.    Do you know about when you would have given him

25 the credit card?

37

Atkinson-Baker Court Reporters
www.depo.com

1     A.   I'm thinking sometime in the spring of 2011.

2   I'm not 100 percent certain of that, but that's what I

3   think.

4     Q.   Was the company credit card to be used for

5   company expenses only?

6     A.   Yes.  Other than if it was used for personal

7   expenses, then he would have to reimburse the company

8   for that.

9     Q.   Okay.  So if Mr. Yerian was traveling, for

10  example, from his home to CMS and he needed to get gas,

11  would the gas be expensable?  Would you allow him to

12  charge the gas --

13    A.   Oh, yes.  Yes.  Yes.

14    Q.   -- to the card?

15    A.   Yes.

16    Q.   Would he also then be entitled to submit a

17  reimbursement for mileage on that same trip?

18    A.   Then the gas expense would have to be deducted

19  from that.

20    Q.   What about meals?  What was the company policy

21  about charging meals to the company credit card?

22    A.   If it was business related.

23    Q.   Can you define business related?  What does

24  that mean, for example?

25    A.   If you were entertaining a customer, if you

38

Atkinson-Baker Court Reporters
www.depo.com

1  were doing -- just trying to think.  If you were

2  traveling and, you know, you needed to eat while you

3  were traveling.  So I mean it wouldn't be for -- I

4  wouldn't use the company credit card to buy my groceries

5  for everyday eating expenses, for instance.

6      Q.   What about just generally repairs to

7  automobiles?  Would that be considered a company

8  expense?

9      A.   That would fall under the same category as gas.

10     Q.   How so?

11     A.   Well, if you take -- if you take a mileage

12  deduction, then that includes repairs, normal

13  maintenance, gas, depreciation, whatever.

14          MR. ANDERSON:  Let's turn back to the binder,

15  tab 6.  If we could have that marked as Trustee's

16  Exhibit 6, please.  For the record, Trustee's Exhibit 6

17  is Bates MS 153 to 168.

18          (Trustee's Exhibit 6 was marked

19      for identification.)

20  BY MR. ANDERSON:

21     Q.   Mr. McLeod, do you have Trustee's Exhibit 6 in

22  front of you?

23     A.   Yes.

24     Q.   What do you recognize Trustee's Exhibit 6 to

25  be?

39

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1     A.    It's a credit card statement.

2     Q.    Okay.  Looking at the middle of the page, it

3  has your name underneath the charges.  Would that be

4  because that card is associated with you?

5     A.    I believe so.

6     Q.    Okay.  So it looks -- just summarizing it,

7  there are a lot of what I'm guessing are restaurant

8  charges.  Would those have been related to, you know,

9  company expenses?

10    A.    Yes.  That was when I was on a trip up to

11  Akron, Ohio to meet with CMS, and those were meal

12  expenses.

13    Q.    I'd like to turn then to MS 159, which is about

14  five pages back.

15    A.    Okay.

16    Q.    This is October -- looking at the third line

17  down, October 28, $360 to United.  What would that

18  charge have been for?

19    A.    That would have been for my airfare from

20  California to Akron.

21    Q.    And what was in Akron again, please?

22    A.    Well, Akron was the nearest airport to where

23  CMS was located.

24    Q.    So that would have been a trip that you would

25  have taken to meet with CMS as part of Mwagusi

John McLeod
May 16, 2016

1  Software's business?

2      A.   Yes.

3      Q.   All right.  If I could please then have you

4  turn to MS 163.

5      A.   Okay.

6      Q.   The top two lines are charges for Lowes.  Would

7  these have been business related or personal?

8      A.   They may have been business related.

9      Q.   All right.  What would you have been buying at

10 Lowes that would have been business related?

11     A.   It could have been something like a light

12 fixture for the office or something like that.

13     Q.   Who is "Sac" Electronics or Du Vac Electronics?

14     A.   Oh, I'm not certain, but I believe I was doing

15 some work for a company called Air Parts International

16 out here in Burbank, and I had to buy some equipment

17 that -- not equipment.  Some fixtures for routing wiring

18 in their office.  And some of the --

19     Q.   Is Air Parts International -- were they a

20 customer of Mwagusi Software during 2012, which is the

21 beginning of this statement?

22     A.   Yes.  Yeah.  I've done work for them for many,

23 many years.

24     Q.   Was that a customer that you brought to Mwagusi

25 Software, or was that one originated by Mr. Yerian?

41

Atkinson-Baker Court Reporters
www.depo.com

1      A.    It was one I brought.

2      Q.    What type of work were you doing for Air Parts

3  International?

4      A.    They had a computer system and a phone system,

5  and sometimes they had problems with it, and I would --

6  they would call me, and I would try and go in and fix

7  it.  Some of it involved hardware, and some of it

8  involved software.

9      Q.    If I could have you turn to Trustee's -- tab 7

10  in the binder --

11     A.    Okay.

12     Q.    -- and have those marked as Trustee's 7.

13         (Trustee's Exhibit 7 was marked

14     for identification.)

15  BY MR. ANDERSON:

16     Q.    Please let me know when we can proceed.

17     A.    Yeah.  We're there.

18     Q.    Okay.  What do you recognize -- or do you have

19  Trustee's 7 in front of you?

20     A.    Yes.

21     Q.    What do you recognize Trustee's 7 to be?

22     A.    It's a bank statement.

23     Q.    Is this the Mwagusi Software checking

24  account --

25     A.    Yes.

42

John McLeod
May 16, 2016

1    Q.    -- ending in 281?

2    A.    Yes.

3    Q.    Okay.  Do you see the middle -- the $500

4  deposit on February 22?

5    A.    Yes.

6    Q.    Would that have been the initial $500 that you

7  made to fund the company?

8    A.    Yes.

9    Q.    If I could have you turn to MS 187, please.

10    A.    Okay.  I'm there.

11    Q.    Do you see the bottom line that says a deposit

12  of $10,000 on June 24, 2011?

13    A.    Yes.

14    Q.    What would that have been from?

15    A.    I believe that was from CMS.

16    Q.    Was it customary for CMS to make large lump sum

17  payments to you in that amount?

18    A.    In 2011, that's the way that we did it.  And

19  then --

20    Q.    Were you billing them hourly for your services

21  in the way that an attorney might?

22    A.    No.

23    Q.    You were not?

24    A.    No.  No.  We would -- I would meet with Dean

25  Barker, and we would say this is the work that needs to

43

John McLeod
May 16, 2016

1   be done, and Keith would be involved in helping assess

2   the number of hours that were required, and then we

3   would arrive at a round figure normally.  We didn't

4   price it out to the last penny.  And so we would agree

5   that we would do such and such and we would charge

6   $10,000.  And then we would do it, and he'd pay us.

7       Q.   But it's essentially flat rate billing at that

8   point for a set service?

9       A.   Pretty much, yeah.  Once we had -- you know,

10  sat down together and all figured out what was going to

11  be involved.

12      Q.   Okay.  If I could have you turn to the next

13  page, to MS 188.

14      A.   Yes.

15      Q.   In the middle of the page under Electronic

16  Withdrawals, the second one down says "Online Payment to

17  First Energy - Ohio Edison, $150."

18      A.   Right.

19      Q.   What would that have been for?

20      A.   That was one of the advances that was made to

21  Keith.  If I recall right, he was living down in Puerto

22  Rico at the time, and it wasn't easy -- the banking

23  situation was not easy, and so instead of sending him a

24  check, then he had no way to pay his bills.  So I would

25  just pay his bills.  He would send me a copy of his

44

Atkinson-Baker Court Reporters
www.depo.com

1  bills, and I would pay them and count it as an advance

2  to him.

3      Q.   Okay.  So that $150 advance, did he ever

4  reimburse the company for that?

5      A.   That was settled up at the end of the year with

6  the $24,000 payment.

7      Q.   Okay.  What about three lines down, "Online

8  Payment to Chase Home Finance $160"?  What would that

9  have been for?

10     A.   Same thing, a bill -- that was one of Keith's

11  bills.

12     Q.   And it's the same with the next one for $1,020?

13     A.   Yes.

14     Q.   All right.  Allstate two lines down, $210, is

15  that also related to Keith?

16     A.   Yes.

17     Q.   What about the Anthem Insurance that was in the

18  middle for $670?

19     A.   I believe that was Keith also.

20     Q.   Was that -- that was for his health insurance

21  though?

22     A.   Yes.

23     Q.   Can you give me one second, please?  All right.

24          What about the next line, Chase Cardmember

25  Services for 110?  That was for Keith?

John McLeod
May 16, 2016

```
 1      A.   It's possible.  I don't know what that refers
 2   to offhand.  I don't know whether it was some kind of a
 3   fee that the bank was charging or what.
 4      Q.   Okay.  If I could have you turn to MS 193,
 5   please.
 6      A.   Okay.  I'm there.
 7      Q.   The deposit in the middle of the page for
 8   $8,500, what would that have been from?
 9      A.   That was, I believe, CMS again.
10      Q.   Okay.  Looking on that same page again, there's
11   two charges for Allstate at the top.  Would those have
12   been paid for Keith?
13      A.   Yes.
14      Q.   Anthem Insurance as well?
15      A.   Yes.
16      Q.   The two Chase Home Finances, 160 and 1,020, are
17   those for Keith?
18      A.   Yes.
19      Q.   First Energy - Ohio Edison, also for Keith?
20      A.   Yes.
21      Q.   What about Aeration Specialties, Inc., at the
22   bottom?
23      A.   That was something for Keith as far as I know.
24   I don't recognize that name.
25      Q.   Okay.  Let me turn the page to 194.  Do you see
```

46

John McLeod
May 16, 2016

1  January -- I'm sorry -- July 6, "Online Payment to Clerk

2  of Courts $500"?

3      A.   Yes.

4      Q.   What was that for?

5      A.   That I do not recall.  I think it was another

6  advance to Keith to tell you the truth.  I had no reason

7  to pay Clerk of the Court.

8      Q.   Okay.  What about three lines down, to Sun Yo

9  Pak dba Open Claims for $500?

10     A.   That was basically an advance to Keith again.

11     Q.   Why did you pay that one to Sun Yo Pak instead

12  of paying it to Keith or for whatever expense he needed

13  directly?

14     A.   If I recall, they were down in Puerto Rico at

15  the time, and somehow or other, she could get money into

16  that account or something.  I just don't know the reason

17  why it was there, but it was -- as I recall, it was to

18  make things workable while they were trying to live in

19  Puerto Rico and pay bills in the U.S.

20     Q.   So Keith requested that you pay that money

21  directly to Sun Yo Pak?

22     A.   Yes.

23     Q.   What about the line directly above that, PNC

24  Mc/Visa?  Would that be for Keith?

25     A.   Yes.

47

1     Q.   What about the Fifth Third Bank for 345

2  directly above that?

3     A.   Same thing.

4     Q.   Okay.  AAA, $94, same thing?

5     A.   Yes.

6     Q.   What about AT&T, $116.10 at the bottom,

7  July 18?

8     A.   I don't know.  That could have been my bill.

9  I'm not sure.

10     Q.   Okay.  If I could have you turn then to MS 199.

11     A.   Okay.

12     Q.   Deposit in the middle of the page, August 10,

13  for $5,400.  Would that have been from CMS?

14     A.   Yes.

15     Q.   What about the one on August 31st for 16,400?

16     A.   Yes.

17     Q.   16,400, that was from CMS?

18     A.   Yes.  As I recall.

19     Q.   Okay.  If we could turn the page to MS 200?

20     A.   Okay.

21     Q.   I'm going to list the line items.  If you could

22  just respond whether or not they're for Keith with a

23  "yes" or "no" we could do it a lot faster, I think.

24          The top two, Allstate, 260 and 55?

25     A.   Yes.

1      Q.    Chase Cardmember Services, 800?

2      A.    Yes.  Okay.  Chase Cardmember Services is a

3  payment to one of Keith's credit cards, I believe.

4      Q.    All right.  Chase Home Finance both $1,020 and

5  160?

6      A.    Yes.

7      Q.    Let me go back up one line.  720 for Anthem

8  Insurance?

9      A.    Yes.  As far as I can see, everything down to

10  PNC Mc/Visa is all Keith's expenses.

11      Q.    Oh, okay.  That would make it very easy.

12      A.    Yeah.

13      Q.    So that's the $500 charge to PNC.  Those are

14  all for Keith Yerian; correct?

15      A.    Yes.

16      Q.    What about third from the bottom Florida -- I

17  think that says FIA online payment for $1,175.08?

18      A.    That I don't know -- remember offhand what it

19  was for.

20      Q.    What about the Discover Card or Discover

21  beneath that?

22      A.    I think that was my expense.  And the same way

23  with the Chase below that.

24      Q.    What about Sprint, August 9, for 182.52?

25      A.    That's -- again, I have a Sprint cell phone,

49

1  and Keith has Sprint cell phone service.  It could have

2  been either one of us.

3      Q.   That's fine.  I don't want you to guess.

4           All right.  If you could turn to MS 205,

5  please.

6      A.   Okay.

7      Q.   The deposit in the middle of the page for

8  $9,570, would that have been from CMS?

9      A.   Yes.

10     Q.   I know it might be hard to recall, but do you

11 see the Checks Paid, check No. 1522 for $3,000?  Do you

12 have any way to recall who that may have been paid to?

13     A.   Either Keith or myself.  I don't know.

14     Q.   Would that have been an advance if it was to

15 either of you?

16     A.   Yes.

17     Q.   Was it a regular practice for either of you to

18 request advances from the company with the understanding

19 that it would be paid back at the end of the year?

20     A.   Only for the first portion of 2011 till we got

21 the payroll set up.

22     Q.   Understood.  Okay.  If you could turn to 206,

23 please.

24     A.   Okay.

25     Q.   Same idea.  If you could just identify "yes" or

50

Atkinson-Baker Court Reporters
www.depo.com

1  "no" whether they're Keith's expenses.

2       The two Allstate?

3     A.    Yes.

4     Q.    Anthem Insurance?

5     A.    Yes.

6     Q.    Chase Home Finance?

7     A.    Yes.  Everything down to Time Warner is Keith's

8  expense.

9     Q.    All right.  That makes it easy.  Thank you.

10 What about the payment to Sun Yo Pak dba Open Claims?

11    A.    Again, that was one that Keith requested be

12 paid there I believe for the convenience of the way it

13 worked down in Puerto Rico.  But I'm not sure.

14    Q.    Okay.  If you could turn to MS 211, please.

15    A.    Okay.

16    Q.    Under Electronic Withdrawals, if you could

17 identify again or confirm which of these would have been

18 for Keith Yerian.

19    A.    Everything down to Discover Card and then Fifth

20 Third Bank and First Energy.

21    Q.    So all of them on that page except for AT&T at

22 the top?

23    A.    AT&T may have been Keith's, I think.

24    Q.    If you could turn to 212, the next page, PNC

25 Mc/Visa, that was Keith's?

51

1      A.    Yes.

2      Q.    If you could turn to MS 215, please.

3      A.    Okay.

4      Q.    Deposits that are referenced in the middle of

5 the page, the one for $4,937.56, do you know who that

6 would have been from?

7      A.    I believe that was -- I believe both of those

8 were from CMS.

9      Q.    Is there any reason that you can recall why one

10 of them -- that's the first one that I can recall that's

11 not round numbers.  Any reason that you can think of?

12      A.    This had to do with the -- we had hired these

13 three students during the summer, and I think it had to

14 do with some expenses, and so I had itemized the

15 expenses and submitted them is my recollection.

16      Q.    And then further down that page, there's a

17 check for 4,000 and a check for 1,000.  Would those have

18 been potential advances?

19      A.    Yes.  Could have been.

20      Q.    Okay.  Next page, please, MS 216.

21      A.    Okay.

22      Q.    If you could identify which ones of those would

23 have been for Keith under Electronic Withdrawals.

24      A.    Looks like everything on that page was advances

25 to Keith.

52

John McLeod
May 16, 2016

1    Q.    Page 219, please, MS 219.

2    A.    Okay.

3    Q.    Let me know when you're there, please.

4    A.    Okay.  I'm there.

5    Q.    The two deposits referenced at the bottom of

6    the page, one for 14,000, one for 4,256, would those

7    have been for CMS?

8    A.    Yes.

9    Q.    Okay.  The next page, please, 220, if you could

10   identify under Electronic Withdrawals which one -- which

11   line items would be identifiable as Keith's expenses.

12   A.    Offhand, I don't know.

13   Q.    Under Electronic Withdrawals?

14   A.    Yes.

15   Q.    So --

16   A.    Electronic Withdrawals.  I'm sorry.  I'm

17   looking at the wrong place.

18   Q.    Yeah.  I want to clarify.

19   A.    Okay.

20   Q.    Under Electronic Withdrawals, can you identify

21   which of those -- this is MS 220 -- which one of those

22   expenses would have belonged to Mr. Yerian?

23   A.    Down through Allstate on 12/12.

24   Q.    And the remainder of those would have been

25   expenses, either your expenses or expenses related to

53

Atkinson-Baker Court Reporters
www.depo.com

1   Mwagusi Software?

2       A.   Right.  Well, the last one may have been --

3   looks like it was a payment to a Visa card for Keith.

4            MR. ANDERSON:  If I could have tab No. 8 marked

5   as Trustee's 8, please.

6            (Trustee's Exhibit 8 was marked

7        for identification.)

8   BY MR. ANDERSON:

9       Q.   Mr. McLeod, do you have the Trustee's 8 in

10  front of you?

11      A.   Yes.

12      Q.   For the record, it's MS 78 through 91.  What do

13  you recognize the Trustee's 8 to be?

14      A.   That's a tax return.

15      Q.   Is this for Mwagusi for 2011?

16      A.   Yes.

17      Q.   So looking at line item 1E, Mwagusi Software

18  grossed $111,920 in 2011?

19      A.   Yes.

20      Q.   All right.  You have the cost of goods sold

21  identified as 17,000 approximately.  What would have

22  been the cost of goods sold for the company?  Like what

23  types of products?

24      A.   I do not recall what that would have been.

25      Q.   Looking at MS 82, it looks like it's tied to

54

1  cost of labor.

2      A.   Oh, maybe that's where that was -- that was

3  book kept.  Yes.  Okay.  That was the funds paid to the

4  interns that we hired during the summer.

5      Q.   All right.  So looking at line item 7,

6  compensation of officers was 31,274.  Was that all to

7  you?

8      A.   Yes.

9      Q.   And what officer role were you holding at that

10  time?

11      A.   I was the 100 percent owner of the company.  I

12  mean I guess --

13      Q.   So salaries and credits the next line down is

14  $23,097.

15      A.   Yes.

16      Q.   Would that have been related to solely Keith?

17      A.   Yes.

18      Q.   Okay.  You have rent expense of $1,250.  Do you

19  know what that would be for?  That's line 11.

20      A.   Yeah.  Oh, I think that was for what we paid to

21  rent the house in Puerto Rico for the time that we were

22  there.

23      Q.   Line 18 has Employee benefit programs of

24  12,664.  What type of Employee benefit programs did you

25  have?

1     A.    Health insurance.

2     Q.    That was for you and Keith?

3     A.    Yes.

4     Q.    If you could please turn to MS 89, please.

5     A.    Yes.  I'm there.

6     Q.    Okay.  Line item 16, you have just over $10,000

7  of telephone expenses.  What types of phones did you

8  have?

9     A.    That's telephone and Internet, all the expenses

10 related to telephone, Internet, and that sort of thing.

11    Q.    Okay.  What about travel and entertainment for

12 7,864?  What would that have included?

13    A.    Travel -- travel to Puerto Rico on Keith's part

14 and my part and travel to CMS on my part.

15    Q.    And that was the Puerto Rico trip in the

16 beginning of 2011 prior to you forming the company?

17    A.    I believe so.  Yes.  Yeah.  I can't swear to

18 that, but that is -- that could have been included in

19 there.

20    Q.    Okay.

21    A.    Just for the record, I considered everything

22 from the beginning of 2011 to the end of 2011 to be all

23 Mwagusi even though it had not been formally formed

24 until February.

25         MR. ANDERSON:  Okay.  If I could have Madam

Atkinson-Baker Court Reporters
www.depo.com

1  Court Reporter mark Trustee's tab 9 as Exhibit 9,

2  please, which is MS 29.

3          (Trustee's Exhibit 9 was marked

4      for identification.)

5  BY MR. ANDERSON:

6      Q.   Mr. McLeod, do you have Trustee's Exhibit 9 in

7  front of you?

8      A.   Yes.

9      Q.   What do you recognize Trustee's 9 to be?

10     A.   It's a Payroll Journal.

11     Q.   This is for the month of February 2012 --

12     A.   Yes.

13     Q.   -- is that correct?

14     A.   Yes.

15     Q.   Is this after you had now gotten your payroll

16  department set up?

17     A.   Yes.

18     Q.   Okay.  So the first person is Dakota Kincer,

19  earnings of $3,333.33.

20     A.   Yes.  He was working full time for CMS.

21     Q.   Okay.  Is that why he's making more money than

22  you and Mr. Yerian?

23     A.   Yes.  I did not want and Keith did not want to

24  be employed full time by CMS because we -- first of all,

25  we wanted to be allowed to have the ability to look for

57

John McLeod
May 16, 2016

1   other work, and we wanted that to be plain to Dean

2   Barker, the owner of CMS, that we were not his

3   employees.  We were simply contractors committed half

4   time to him; so --

5       Q.   So then you had Dakota Kincer working full time

6   for you as your full-time employee essentially?

7       A.   Yes.

8       Q.   And he wasn't responsible for business

9   development?

10      A.   No.

11      Q.   What were his hours?

12      A.   He was assigned on site at CMS.  So he worked

13  whatever hours CMS was open basically, normal business

14  hours as far as I know.

15      Q.   All right.  So he was working for you, and then

16  CMS was paying -- he was working for you at CMS, and CMS

17  was paying you for the services that he was providing

18  full time?

19      A.   Yes.

20      Q.   Okay.  What ended up happening with his

21  employment, Mr. Kincer's, with Mwagusi?

22      A.   After about a year, he -- late in 2012, Dean

23  Barker, the owner of CMS, came to me and said he wanted

24  to hire Dakota full time as a direct employee with CMS,

25  And that was fine with me because that had been part of

58

Atkinson-Baker Court Reporters
www.depo.com

1  the objective of the CMS project was to transition them

2  to have their own programming staff.  So now he would

3  have Brian Havran and Dakota Kincer as his direct

4  employee of programming stuff.

5      Q.   Was CMS then paying you a premium above what

6  Dakota Kincer was making?

7      A.   Yes.

8      Q.   Okay.  If you could recall -- or you may have

9  testified to this earlier.  Just so I'm clear, how were

10  you introduced to Dakota Kincer?

11      A.   I think we had talked with Dean Barker about

12  hiring these interns in the summer, and Keith had

13  previously worked at -- as I understand it anyway, had

14  been an instructor at the college there, and he knew the

15  ropes and went and did whatever he did -- you'd have to

16  ask him -- to solicit applications from some students

17  who wanted summer employment.  And that's where Dakota

18  Kincer came from along with Brian Havran.

19           MR. ANDERSON:  Can the court reporter please

20  mark tab 10 as Trustee's 10.  This is for the record MS

21  136 through 138.

22           (Trustee's Exhibit 10 was marked

23      for identification.)

24  BY MR. ANDERSON:

25      Q.   Mr. McLeod, can you please review these three

59

John McLeod
May 16, 2016

1    pages and let me know when you are done?

2         A.   Yes.  Okay.  I've done it.

3         Q.   Okay.  So the MS 136 appears to be an e-mail

4    from Mr. Yerian to you requesting a cashier's check to

5    Host Realty, Inc.; is that correct?

6         A.   Yes.  Yes.

7         Q.   Can you tell me the circumstances that

8    surrounded him requesting a $2,000 check from you to

9    Host Realty?

10        A.   Okay.  I don't know the exact reason, but he

11   was in the process with his retirement fund of buying a

12   house for -- down in Florida for investment purposes,

13   and he needed $2,000 to handle the closing.  And he

14   asked if the company could forward that to him and he

15   would pay us back once it closed.  And so I --

16        Q.   So this isn't part of the advancing expenses

17   like you would have done in 2011 because you have

18   your --

19        A.   No, no.  This was a one-time thing more or less

20   as a favor.

21        Q.   Okay.  Did you, in fact, advance $2,000 to Host

22   Realty, Inc., pursuant to the request in this e-mail?

23        A.   Yes.

24        Q.   Okay.  Do you have any knowledge whether the

25   address 1381 Southwest Giddings Street in Palm Bay is

1  the property he was trying to purchase?

2       A.    I don't know for sure -- I know he has a

3  property there.  Well, he's told me he has, but I don't

4  know the address for sure.  But that sounds right.

5       Q.    Okay.  The next page which is 137, this is a

6  receipt that you produced that says Host Realty with a

7  signature in the middle of the page.  Is that your

8  signature?

9       A.    Yes.

10      Q.    What is this a return receipt for or shipping

11 receipt for?

12      A.    That was for the check.  I Express Mailed it to

13 Host Realty.

14      Q.    Okay.  So the next page then MS 138 appears to

15 be a shipping receipt from Mwagusi Software.  Is that

16 your signature in the middle of the page on MS 138?

17      A.    Yes.

18      Q.    What was this shipping receipt for?

19      A.    Again, I'm not familiar with the -- all the

20 details, but Keith was in the process -- had set up a --

21 again, this is my understanding.  He had set up a

22 self-directed IRA that was buying this house in Palm

23 Bay, Florida, and I believe this was -- again, this was

24 an advance that he asked me if I would do to pay for

25 some of the legal fees involved with that.  And so I did

61

1   that, and then he repaid us later on or repaid me.

2         MR. ANDERSON:  Madam Court Reporter, if you

3   could have tab 11 marked as Trustee's 11, please.  For

4   the record, that's Trustee's 814 at the bottom.

5         (Trustee's Exhibit 11 was marked

6     for identification.)

7   BY MR. ANDERSON:

8     Q.   Do you recognize Trustee's 11, Mr. McLeod?

9     A.   Yes.

10     Q.   What do you recognize Trustee's 11 to be?

11     A.   That was the check we just discussed.

12     Q.   So $1,575 to Self Directed IRA, LLC?

13     A.   Right.

14     Q.   Is that your signature on the check?

15     A.   Yes.

16     Q.   So this is different than the $2,000 that he

17   had asked you to send to Host Realty referenced in

18   Trustee's 10?

19     A.   Right.

20     Q.   Could you square the two for me, please.

21     A.   They were -- again, I don't know.  He asked me

22   to send this check and the $2,000 check to two different

23   places, and I did that.  And then later on, he repaid us

24   $3,575.  Or he paid me -- he repaid Mwagusi $3,575.

25         MR. ANDERSON:  Okay.  Then if I could have tab

1   12 marked as Trustee's 12, please.

2           (Trustee's Exhibit 12 was marked

3       for identification.)

4   BY MR. ANDERSON:

5       Q.   All right.  So Mr. McLeod, this I believe is

6   the check that you had referenced.

7       A.   Yes.

8       Q.   I'm sorry.  This is Trustee's 3490 for the

9   record.  Is this the check that you referenced

10  previously where Mr. Yerian paid the company back?

11      A.   Yes.

12      Q.   Okay.  And can you read what it says under

13  Notes on the check?

14      A.    It says looks like "Reimbursement of LLC start

15  up costs."

16      Q.   Why would Mr. Yerian have paid you back for the

17  loan from his property and reference reimbursement of

18  LLC startup costs?

19      A.   I don't know.  I didn't put that note on there.

20      Q.   Okay.  But you would agree with me that that's

21  not an accurate statement of what that $3,575 was for;

22  right?

23      A.   Again, I don't really know what it went for in

24  the first place.  So it's hard to say -- hard for me to

25  say what the reimbursement was.  I just know that I was

63

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    asked to make these two advances on the promise that I

2    would be repaid, and in fact, I made the advances, and I

3    was repaid.

4        Q.    Did Mr. Yerian ever pay any of the start-up

5    costs for Mwagusi Software?

6        A.    No.

7        Q.    So then this wouldn't be a check, in fact, for

8    reimbursement of start-up costs.

9        A.    Not of Mwagusi Software, no.

10            MR. WOLFF:  Object to the form of the question.

11            You can answer.

12   BY MR. ANDERSON:

13       Q.    Can you repeat your answer, please.  I didn't

14   hear it.

15       A.    I said no, this would not have been a check

16   related to the start-up costs for Mwagusi Software.

17   They were paid a year earlier.

18       Q.    Okay.  Is that your handwriting?  I think that

19   says "For deposit only" on the back of that check.

20       A.    Yes.

21       Q.    Okay.  At some point, did it become necessary

22   for Mr. Yerian to relocate to Florida from Ohio?

23       A.    Yes.

24       Q.    Let me withdraw question.  That wasn't put very

25   well.

64

1          Did Mr. Yerian end up moving from Ohio to

2    Florida?

3          A.   Yes, he did.

4          Q.   Do you know about when that was?

5          A.   In about if I recall August of 2012.

6          Q.   Do you know why he left Ohio to come to

7    Florida?

8          A.   Well, one of the things was that back in

9    Florida -- and again, it was -- it ended up in Florida,

10   but anyway, Florida was closer to Georgia where we were

11   hoping to get some more business from Pegasus Software,

12   and there was another customer in Florida that was also

13   obviously close to Florida.  And then I think he had

14   some personal issues that he had -- wanted to resolve.

15         Q.   Okay.  So let me start with Pegasus Software

16   then.  They are based out of where in Georgia?

17         A.   Atlanta, Georgia.

18         Q.   And do you know where Mr. Yerian ended up

19   relocating to in Florida?

20         A.   Grant.

21         Q.   Do you know how far Grant, Florida is from

22   Atlanta, Georgia?

23         A.   Not offhand.  It's a good day's drive though.

24         Q.   Okay.  And Pegasus Software was in Georgia.

25   What was the second company that you were hoping to get

Atkinson-Baker Court Reporters
www.depo.com

1  business from?

2      A.   There was a guy named John Putnam who lived

3  down there.  Again, my understanding.  And we later did

4  get some work from I think it was his son from a company

5  called Nanotronics.

6      Q.   So how did Mr. Yerian's relocation benefit

7  Mwagusi Software?  I know you said that you got business

8  from John Putnam.  Did Pegasus Software end up becoming

9  a customer?

10      A.   Yes.

11          MR. ANDERSON:  If I could have Trustee's 13 --

12  tab 13 marked as Trustee's 13, MS 149 through 151.

13          THE WITNESS:  Okay.  I'm there.

14          (Trustee's Exhibit 13 was marked

15      for identification.)

16  BY MR. ANDERSON:

17      Q.   Okay.  Can you identify what Trustee's 149 and

18  150 are only at this point, please?

19      A.   It's a Job Invoice.

20      Q.   Okay.  Who is Northeast Ohio Mover Services?

21      A.   That I don't know.  I assume it was someone

22  that did some packing for -- associated with Keith's

23  move.

24      Q.   Is that your signature at the bottom of 149?

25      A.   No.

John McLeod
May 16, 2016

1      Q.   How is it that 149 and -- I'm sorry.  Let me

2  withdraw.

3           Do you know who Northeast Ohio Mover Services

4  is?

5      A.   No, I don't.

6      Q.   Do you know who signed this document?

7      A.   No, I don't.

8      Q.   Okay.  How is it that 149 and 150 ended up in

9  Mwagusi's possession for production in response to our

10  request to produce?

11      A.   As far as I know, they were not in anything

12  that I produced.

13      Q.   Have you ever seen 149 and 150 before?

14      A.   No.

15      Q.   If you could turn to 151, please.

16      A.   Okay.

17      Q.   Have you ever seen 151 before?

18      A.   No.  Not that I recall.  But you know, it's

19  kind of hard to read it.

20      Q.   Okay.  Looking at what appears to be part of an

21  e-mail on the left side of 151, have you ever seen this

22  e-mail before?

23      A.   Yeah.  I think so.  Four years ago.

24      Q.   Is your e-mail address jmcleod129@gmail.com?

25      A.   Yes.

67

John McLeod
May 16, 2016

1    Q.   So this document was produced by your company,

2  151, and on the right it looks like there's a Chase

3  receipt depositing $8,000 into an account ending 2259.

4  What is this receipt for?

5    A.   I'm putting these two things together.  I think

6  that that was for a deposit made to Jeff Waickman's

7  account if I understand right.  But I could be wrong.

8    Q.   Okay.  Who is Jeff Waickman?

9    A.   He was the guy who did the -- moved Keith from

10  Ohio to Florida.

11    Q.   Is he a mover?

12    A.   I believe so.

13    Q.   Does he work for CMS?

14    A.   No.  He had -- he was associated with CMS in

15  some manner.  That's how I came across him, but I don't

16  really know much about him.

17    Q.   Did you end up depositing $8,000 into an

18  account ending 2259?

19    A.   It looks like that was done.  I don't recall it

20  offhand, but I recall that we did pay Keith's moving

21  expenses, and this may have been part of it.

22    Q.   Okay.  Do you recognize JP Morgan Chase Bank,

23  Honolulu Avenue branch, and then 740815?  Is Honolulu

24  Avenue close to you, or is that an area that you

25  recognize?

68

Atkinson-Baker Court Reporters
www.depo.com

1    A.    That's near me.

2    Q.    Okay.  Do you know why this e-mail would have

3  been sent from Young Yerian but signed by Keith?

4    A.    Not really.

5    Q.    Okay.  Switch gears a little bit.  Does or did

6  Mwagusi Software ever pay Sun Pak for rent?

7    A.    Yes.

8    Q.    Okay.  When did that start?

9    A.    I believe that started like August or September

10  of 2012.

11    Q.    Okay.  How much was the rent payment?

12    A.    $1,000 a month.

13    Q.    Okay.  Why did Mwagusi Software pay Sun Pak for

14  rent?

15    A.    Because, again, it's my understanding that she

16  owns the house where Keith and she reside, and there was

17  a dedicated office in there for the use of Mwagusi

18  Software.

19    Q.    How did you determine that a thousand dollars

20  was an appropriate amount for rent?

21    A.    That seemed -- you know, looking at the market

22  and the size of the office, and that was the figure that

23  was agreed upon.

24         MR. ANDERSON:  Okay.  If I could have the

25  Trustee's tab 14 marked as Exhibit 14.  For the record,

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1 we're looking at MS 23, 24, 25, and 26.  Can you review

2 those for me, please, Mr. McLeod?

3     A.   Yes.

4         (Trustee's Exhibit 14 was marked

5     for identification.)

6 BY MR. ANDERSON:

7     Q.   Do you recognize these documents?

8     A.   Yes.  Those are rent payments or invoices for

9 rent.

10     Q.   This is for September, October, November, and

11 December, 2012?

12     A.   Yes.

13     Q.   Did Mwagusi, in fact, make those four payments?

14     A.   Yes.

15     Q.   Okay.  Was Mr. Yerian doing work for Mwagusi

16 from January through July of 2012 for Mwagusi?

17     A.   Yes.

18     Q.   Why did he -- or why did Pak not receive any

19 rent for those months?

20     A.   Well, because he was working out of his --

21 well, no.  He was working at CMS during those months.

22 He moved from Ohio to Florida, and when he -- again, my

23 understanding, when they moved to Florida, Sun Pak

24 bought the house, and that's when we started paying

25 rent.

70

John McLeod
May 16, 2016

1    Q.   Okay.

2    A.   Before that, he was provided an office at CMS.

3    Q.   So is the reason that you billed to Pak because

4  she owns the property?

5    A.   Yes.

6    Q.   Why not -- withdraw that.

7         Did Mr. Yerian ever request that you pay the

8  rent directly to her?

9    A.   I don't know whether he requested it or not.

10 You know, I think I may have said, "Where should I pay

11 it?" or "Who should I pay it to?" and --

12   Q.   And Mr. Yerian would have said, "Pay it

13 directly to Pak"?

14   A.   Yeah, because it was her house.

15   Q.   Otherwise you wouldn't have had any reason to

16 know to pay her directly?

17   A.   Right.

18   Q.   Unless he had told you?

19   A.   Right.

20   Q.   All right.  So then did you -- so that was

21 through the end of 2012.  What about during 2013?  Would

22 you have made thousand dollar monthly payments to her

23 during all the months of 2013?

24   A.   Yes.

25   Q.   What about 2014?

71

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      A.   Yes.

2      Q.   And 2015?

3      A.   Yes.

4      Q.   And through present date?

5      A.   Continuing, yes.

6           MR. ANDERSON:  All right.  If I could have tab

7   15 of the binder marked as Trustee's 15 which for the

8   record is MS 152.

9           (Trustee's Exhibit 15 was marked

10     for identification.)

11  BY MR. ANDERSON:

12     Q.   Mr. McLeod, have you ever seen this document

13  before?

14     A.   Yeah.  You know, that was an online payment

15  made, I believe.

16     Q.   To Anthem Insurance?  What would that have been

17  for?

18     A.   That would have been Keith's health insurance.

19     Q.   And that was paid for as an expense of the

20  company?

21     A.   Yes.

22     Q.   Was Mwagusi paying for any other employees'

23  health care at this time?

24     A.   Yes.  We paid for all the employees' health

25  care.

72

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    Q.    Which at this point in August or December of

2    2012 would have been you, Dakota, and Mr. Yerian?

3    A.    Yes.

4         MR. ANDERSON:  All right.  If I could have

5    Trustee's tab 16 marked as Exhibit 16, please.  For the

6    record, that's MS 92 through MS 105.

7         (Trustee's Exhibit 16 was marked

8    for identification.)

9    BY MR. ANDERSON:

10   Q.    Mr. McLeod, can you review this document and

11   let me know what you recognize it to be?

12   A.    That's a tax return from --

13   Q.    Mwagusi tax return from 2012?

14   A.    Yes.

15   Q.    Okay.  So looking at line 6, total income of

16   $217,908; is that correct?

17   A.    Yes.

18   Q.    What would you attribute the significant jump

19   in income from from 2011 to 2012?

20   A.    We -- let's see.  In 2012, we had three of us

21   working, myself and Keith and Dakota.  And we were

22   billing -- as I recall we had agreed with -- or I had

23   agreed with Dean Barker to bill CMS $15,000 a month.

24   Q.    So you went from instead of flat rate for

25   certain jobs to being on essentially a $15000-a-month

Atkinson-Baker Court Reporters
www.depo.com

1  retainer?

2      A.   Right.

3      Q.   And that was in addition to whatever other work

4  you were generating from your other customers?

5      A.   Right.

6      Q.   All right.  So that's 15,000.  So of the

7  217,000, approximately 180,000 would have been

8  attributed to CMS?

9      A.   Yes.  And there may have been some other

10  billings to CMS for incidental things in there too.

11      Q.   Okay.  The compensation of officers identified

12  on mine, 7, $35,000, is that exclusively to you?

13      A.   Yes.

14      Q.   Salaries and wages for 77,340, is that --

15  that's between --

16      A.   Keith and Dakota.

17      Q.   The rent for $8,600?

18      A.   Yes.

19      Q.   Is that attributed to the rent for Pak for the

20  rental of the house?

21      A.   Yes.  And there was a period in there -- I

22  believe this is 2012 -- trying to think here.  That

23  would have been the $4,000 to Pak, and I'm not sure what

24  the other part came from.

25      Q.   Are the --

74

1     A.    Oh, okay.

2     Q.    Go ahead.

3     A.    It may have been -- we took the two interns

4  down to Puerto Rico for training to be away from CMS,

5  and that may have been the rent on the house when we

6  were down in Puerto Rico.  I'm not sure what's all in

7  there.

8     Q.    So that trip to Puerto Rico is the business

9  expense?

10    A.    Yes.

11    Q.    Training these employees?

12    A.    Yes.

13    Q.    All right.  So looking at line 17, pension,

14  profit-sharing $2,010, what is that for?

15    A.    After I started the payroll, one of the things

16  that I decided to do was to set up a 401(k) plan for the

17  company so that -- for the benefit of Keith and Dakota.

18  And so I set it up, and I was -- I put myself in it, but

19  then Keith and Dakota didn't have any interest in being

20  in it.  And so I set it up and spent the money to set it

21  up and then turned around and shut it down.

22    Q.    Okay.  The employee benefit program of 14,554,

23  was that the health insurance again?

24    A.    Yes.

25    Q.    Okay.  If you could turn to MS 98, please.  Let

1   me know when you're there.

2       A.   Yep.  I'm there.

3       Q.   Is this the K-1 that you received for 2012?

4       A.   Yes.

5       Q.   Did you personally report ordinary business

6   income of $3,418?

7       A.   Yes.

8       Q.   Okay.  If you could turn then, please, to MS

9   103.

10      A.   Okay.

11      Q.   All right.  So if you look at No. 10, it says

12  legal and professional fees of $11,000.  What would that

13  be for?

14      A.   Yes.  This was relating to the lawsuit that was

15  filed up in Ohio by Keith's ex-wife, and this was legal

16  expenses associated with that.

17      Q.   Okay.  Skipping down then to 18, travel and

18  entertainment expense of $20,528, what was that for?

19      A.   That would have been primarily -- a big chunk

20  of that would have been for the money to bring the

21  interns down to Puerto Rico and feed and house them

22  while they were there.

23      Q.   When was that trip, the trip with the interns?

24      A.   It was in like February or March of 2012.

25      Q.   Okay.  And who went on that trip?

76

1      A.   Keith was down there, and I was there.   And

2  then we brought the interns in separately for about ten

3  days each.   So and that was the people.

4      Q.   Was your wife there?

5      A.   I do not recall.   She was on one of the trips,

6  I know.

7      Q.   Was Mr. Yerian's wife on that trip?

8      A.   Yes.

9      Q.   Would you have paid for Mr. Yerian's wife's

10 expenses as part of that trip?

11     A.   For the business related stuff, but again, my

12 recollection is that they wanted to stay longer after

13 the interns and I returned, and they did, but they paid

14 for that themselves.

15     Q.   But during the time that the two interns were

16 there, you were paying the rent -- or I'm sorry --

17 the -- yeah, I guess the rent or the leasing fee on the

18 place where you stayed for everyone that was there?

19     A.   Yes.

20     Q.   What about the food for everyone?

21     A.   Same thing.

22     Q.   The drinks?

23     A.   Same thing.

24     Q.   Same thing?   All right.   So line 21, employee

25 relocation expenses, that's all the money -- was that

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1   all the money related to Keith moving to Florida?
 2       A.   Yes.
 3       Q.   What about the office equipment and furniture?
 4   Who would that have been for?
 5       A.   In 2012, both Keith and I had old computers
 6   that were -- had died or were about to die, and so we
 7   bought new computers.
 8            MR. ANDERSON:  Okay.  If I could have Trustee's
 9   tab 17 marked as Exhibit 17.
10            THE WITNESS:  Okay.  I'm there.
11            (Trustee's Exhibit 17 was marked
12       for identification.)
13            (Telephonic connection lost - recess.)
14   BY MR. ANDERSON:
15       Q.   Mr. McLeod, are you present?
16       A.   Yes.
17       Q.   Okay.  So do you have Trustee's 17 in front of
18   you which is MS 61?
19       A.   Right.
20       Q.   Okay.  What do you recognize Trustee's 17 to
21   be?
22       A.   W-2 statements.
23       Q.   Okay.  This is for 2012?
24       A.   I believe so.
25       Q.   Okay.  And during 2012, did Mwagusi pay
```

78

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  Mr. Kincer $33,333?

2      A.   Yes.

3      Q.   As reflected on this?

4      A.   Yes.

5      Q.   And yourself, you were paid $35,050?

6      A.   Yes.

7      Q.   And Mr. Yerian, 30,000?

8      A.   Yes.

9          MR. ANDERSON:  All right.  If I could have

10 Trustee's 18 or tab 18 of the binder marked as Trustee's

11 Exhibit 18, which for the record is MS 257 through 276.

12          THE WITNESS:  I'm there.

13          (Trustee's Exhibit 18 was marked

14      for identification.)

15 BY MR. ANDERSON:

16      Q.   Okay.  Take a second, please, to review these

17 documents and let me know when you're ready.  Let me

18 know what they are.

19      A.   Credit card statements.

20      Q.   And this is account ending 3356.

21      A.   Yes.

22      Q.   Okay.  So I'd like to turn your attention to MS

23 259.  Let me know when you're there.

24      A.   Okay.

25      Q.   This is a statement dated July 20, 2012 to

79

John McLeod
May 16, 2016

1  August 19, 2012.  Do you see in the middle of the page

2  it references Keith Yerian?  Is that because Mr. Yerian

3  had a company credit card at this point?

4       A.   Yes.

5       Q.   Okay.  And that would have been -- would this

6  have been the first month that he had a company credit

7  card, or would there have been previous statements?

8       A.   I don't recall.  I don't recall.

9       Q.   Okay.  If I could turn your attention to 261.

10 I kept them in order of the Bates stamps, but you'll see

11 that statement kind of goes out of order.  You have

12 page 1 and then page 3 and then page 2 if that makes

13 sense.

14      A.   Okay.

15      Q.   But I kept them in Bates order, and I'll refer

16 to the numbers.  If you could turn to 263, looking at a

17 charge on August 21st, AAA Auto Club for $95 charged by

18 Mr. Yerian.  What would that have been for?

19      A.   I would assume it's his AAA membership.

20      Q.   And that was an expense covered by Mwagusi?

21      A.   Yes, because he was using his car to drive back

22 and forth to Ohio.

23      Q.   What about on August 28th, Bright House

24 Networks, $109.43?

25      A.   That's his Internet service.

Atkinson-Baker Court Reporters
www.depo.com

1      Q.    That's his home Internet?

2      A.    That's the Internet in the office in Palm Bay

3  or Grant, Florida.

4      Q.    So in Pak's house?

5      A.    Yes.

6      Q.    Okay.  What about -- let's see -- Buffalo Wild

7  Wings September 18th, Melbourne, Florida?  I think it's

8  pretty close to his house, but I won't testify to it.

9  Is the understanding that food charged on the company

10  credit card is supposed to be for company expenses or

11  travel while traveling for the company?

12     A.    Yes.

13     Q.    Okay.  If I could turn your attention to MS

14  265, in the middle or the bottom of the page, there

15  appears to be a flight purchased on your card for

16  American Airlines, 301.20.  What was that for?

17     A.    That was a trip back to CMS.

18     Q.    From L.A. to Cleveland?

19     A.    Yes.

20     Q.    Okay.  If you could turn to MS 267, please.

21     A.    Okay.  I'm there.

22     Q.    Okay.  In the middle, October 5th, Florida Bulb

23  & Ballast.  What would that be for?

24     A.    I do not know offhand.

25     Q.    Looking up five lines from there, do you see

81

Atkinson-Baker Court Reporters
www.depo.com

1  Amazon for $850?  What would that have been for?

2      A.    That is probably for computer stuff.

3      Q.    All right.  The Bright House that's on

4  September 27, that's going to be the Internet for Pak's

5  house?

6      A.    Right.

7      Q.    If there are any Bright House Networks charges

8  for Mr. Yerian, is it fair to assume that those will all

9  be Internet or phone charges for Pak's house?

10     A.    Yes.

11     Q.    So let me look at October 15th, the Sunshine

12  Food Mart -- this is just an example -- located in

13  Grant, Florida.  Isn't that where Mr. Yerian lives?

14     A.    Yes.

15     Q.    So would it be standard for the company to pay

16  for his groceries in the city where he lives?

17     A.    Not unless he was doing something business

18  related, and I don't -- can't recall what he might have

19  been doing at that date.  I know I visited down in

20  Florida a couple of times, and I may have been -- I just

21  don't know.

22     Q.    Okay.  Let me turn your attention to MS 271.

23     A.    Okay.

24     Q.    So just looking generally at the charges that

25  start below the line in the middle of the page, which

John McLeod
May 16, 2016

1  are going to belong to Mr. Yerian, there are various

2  states, Ohio, West Virginia, Georgia, you know,

3  Pennsylvania.

4      A.   Those are expenses from his trips driving to

5  and from CMS.

6      Q.   That would be from Grant, Florida to CMS?

7      A.   Yes.

8      Q.   Which is in Akron, I think you said before?

9      A.   Somewhere near Akron.

10     Q.   Okay.  Let's turn to MS 273.

11     A.   Okay.

12     Q.   Two $300 Sprint Wireless charges on

13  November 24th which are below the line and will be

14  referenced as Mr. Yerian's.  What would those be for?

15     A.   That I am not sure.

16     Q.   Okay.  Turn your attention, please, to 275, MS

17  275.  I'll start from the bottom and work my way up.

18  There's a $404 charge for H.H. Gregg in West Melbourne.

19  What would that be for?

20     A.   I am not sure.  It may have been for some

21  office equipment.

22     Q.   All right.  Looking up to about ten more lines,

23  December 10, Greenleaf Family which I think is Center in

24  Ohio for $300.  What would that be for?

25     A.   I think that may be some kind of a medical

Atkinson-Baker Court Reporters
www.depo.com

1  expense, but you'd have to ask Keith about that one.

2     Q.   So was Mr. Yerian free to charge his medical

3  expenses to the company credit card?

4     A.   To a small amount, yeah.  The company will

5  cover like copays and things like that.

6     Q.   And I mean you said generally to an amount.  I

7  mean is that $5,000?  Is that $10,000?  What type of

8  amount will you cover for?

9     A.   Probably up to a couple of thousand dollars in

10 a year.

11    Q.   So doesn't sound like you had a very stringent

12 system upon tracking what was being expensed or

13 purchased on the company credit card.

14    A.   I checked it every -- check it every time it

15 comes in and, you know, look for things that don't look

16 correct, but yeah.  I mean we were more limited by the

17 amount of money that we had in the bank than anything

18 else.  In other words, if Keith or I came up with a

19 $50,000 medical expense, the company would have had no

20 money to pay that.

21         MR. ANDERSON:  Okay.  If I could have Trustee's

22 19 or tab 19 marked as Trustee's 19, please.

23         THE WITNESS:  Okay.  I'm there.

24         (Trustee's Exhibit 19 was marked

25    for identification.)

84

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  BY MR. ANDERSON:

2      Q.    Take a look.  This is MS 223 through 256.

3      A.    Okay.

4      Q.    Take a look at this and let me know what you

5  recognize it to be.

6      A.    Credit card statements.

7      Q.    Okay.  So this one, last four digits are 7296,

8  and the previous one which is Trustee's 18 is a

9  statement ending 3356.  So did you have two separate

10  credit card statements?

11      A.    They changed the number on us at some point

12  here.  Chase did.  I don't know why.

13      Q.    Okay.

14      A.    They sent us new cards.

15      Q.    So these statements are from February 12 --

16  sorry -- February 13, 2012 through August of 2012, and

17  then Trustee's 18 picks up in September 2012.  So is it

18  your belief that the 7296 was -- you know, was converted

19  into account 3356 starting September 2012?

20      A.    Something like that, yes.  I remember Chase

21  changed it and sent us new cards, and it wasn't clear to

22  me why, but we used them.

23      Q.    So then these statements would have preceded

24  Trustee's 18, but we'll walk through them.  Turning your

25  attention to MS 229 -- just to clarify the record, has

85

John McLeod
May 16, 2016

1  this been marked as Exhibit 19?

2      A.   Yes.

3      Q.   Okay.  Thank you.  Mr. McLeod, let me know when

4  you're at MS 229, please.

5      A.   Yes.  Okay.  I'm there.

6      Q.   Four lines down there's a $449 charge on your

7  account, Nevada LLC Corporation.

8      A.   Yes.  That's the corporation in Nevada that set

9  up the company, and this was the renewal of our

10 registration in the state of Nevada.

11     Q.   Okay.  So then halfway down there is a flight

12 from looks like Cleveland to SJU.  What airport code is

13 SJU?

14     A.   That's San Juan Puerto Rico.

15     Q.   Okay.  So this is a flight -- so February 6th,

16 that was a flight you purchased to Puerto Rico?

17     A.   Yes.

18     Q.   Okay.  Would that have been for you?

19     A.   I believe that was for Keith.  I don't recall

20 flying from Cleveland to Puerto Rico myself.

21     Q.   Okay.  So then on February 8, skipping down a

22 little bit, there's the same flight it looks like on

23 American from L.A. to San Juan.  Would that have been

24 for you?

25     A.   Yes.

John McLeod
May 16, 2016

1      Q.    Was that the Puerto Rico trip in 2012 where you

2 took the interns?

3      A.    Yes.  I believe so.  Yeah.  It's February,

4 yeah.

5      Q.    Okay.  So turning to MS 239 --

6      A.    Okay.  Yes.

7      Q.    -- there's another flight from looks like L.A.

8 to Cleveland.  Would that have been another flight for

9 you to go see CMS?

10     A.    Yes.

11     Q.    And then these charges that are on there, you

12 know, just picking out a few, there's a Burger King,

13 Jake's Restaurant, Golden Dragon Restaurant.  Would

14 those have all been potentially meals for you or Keith

15 while you were in Ohio visiting CMS?

16     A.    Yes.

17     Q.    Turning to 245, please, MS 245 --

18     A.    Okay.

19     Q.    -- there's a charge on April 26th for $325,

20 Nevada LLC Corp.  Is that another registration fee or

21 something with --

22     A.    Yes.

23     Q.    -- the state?

24           Okay.  Turning to 249 please, MS 249.

25     A.    Okay.  Yes.

1    Q.   Sorry.  251, not 249.

2    A.   Okay.

3    Q.   This as far as I can see is the first statement

4   that has Mr. Yerian on it.  Do you see his name there in

5   the middle of the page?  This is a statement of May 20,

6   2012.  Would this be the first statement that he would

7   have appeared or the first time that he would have used

8   the company credit card?

9    A.   Quite possibly.  Although it seems like he

10   would have had the card earlier than this date, but I

11   just don't recall.

12    Q.   Okay.  Turning to MS 253, please.

13    A.   Okay.

14    Q.   Okay.  Looking at Mr. Yerian's statements,

15   June 19th, Steven Q Paris, DDS, for $107, what would

16   that be for?

17    A.   Dental expenses, I assume.

18    Q.   That's Keith's dental expenses?

19    A.   Yes.

20    Q.   And then the other one that's another $113 a

21   couple lines down from that, would that also have been

22   his dental expenses?

23    A.   Right.

24    Q.   Okay.  Let's see.  If I could have Trustee's

25   tab 20 in the binder, please, marked as Trustee's 20,

88

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  which is MS 301 through 350.

2       (Trustee's Exhibit 20 was marked

3     for identification.)

4  BY MR. ANDERSON:

5     Q.   If you could please turn to MS 303.

6     A.   Yes.

7     Q.   There are three deposits located on the bottom.

8  Can you identify which one -- what those are from?

9     A.   The one on the 3rd was from CMS, and that was

10 for the balance due from 2012 for the interns and things

11 like that.

12      The one on the 24th was the start of the

13 $15,000-a-month thing.

14      And the $2,200, I am not sure offhand what that

15 is.

16    Q.   Okay.  Just to make it clear because I think

17 you misstated top and bottom, the 17,740 is for the

18 interns winding up with CMS, and the $15,000 is the

19 first monthly statement from CMS?

20    A.   Yes, yes.

21    Q.   Okay.  Please turn to the next page, MS 304.

22    A.   Okay.

23    Q.   On January 5th in the middle of the page under

24 Electronic Withdrawals, there's a $4,000 Fedwire Debit

25 A/C Keith Yerian.   What's that for?

John McLeod
May 16, 2016

1      A.    I believe that may have been the balance due to

2  Jeff Waickman for the moving expenses because he was

3  paid $12,000 for the moving expenses, and we had the one

4  deposit for 8,000.  I think this 4,000 is the balance of

5  that.

6      Q.    How much -- what kind of possessions -- I mean

7  did Mr. Yerian when he moved to Florida, was he

8  relocating a whole house worth of, you know, furniture

9  and property?

10     A.    As far as I know.  He had -- I know he had a

11 house in Ohio.

12     Q.    Can you look under Electronic Withdrawals on MS

13 304 and identify whether any of these expenses there are

14 for Mr. Yerian?

15     A.    Well, the Sprint -- the Sprint bill, I

16 believe -- well, that's either his or mine.  The AT&T is

17 his.  Capital One is probably mine.  The Chase -- I

18 don't know what the Chase Epay is offhand.  Another

19 Sprint payment for $300.  I don't know whether that's

20 his or mine.  I got new phones from Sprint at one point;

21 so I had to pay for those.  But I don't recall.  It was

22 four years ago.

23     Q.    When you say they're his or mine, does that

24 mean he's using them -- that's his cell phone for the

25 business or that's his phone for personal use?

90

1      A.    It's his cell phone.  The business doesn't own

2  it.  He owns it, but it's his --

3      Q.    He gets a monthly bill through the company?

4      A.    It's his Sprint account, and it's used almost

5  exclusively for business; so --

6      Q.    If you could turn to MS 309, please.

7      A.    Okay.

8      Q.    There's a $14,500 deposit on February 21st.

9  What's that for?

10      A.    That is for -- that's from CMS, and what

11  happened was after I talked with Dean Barker, he said

12  that he thought we were charging too much for Dakota

13  Kincer; we marked him up too much.  And so we agreed to

14  reduce it to 14.5 instead of 15.

15      Q.    Was that 14.5 then moving forward, or did it go

16  back to 15,000?

17      A.    As I recall, that's what we paid moving

18  forward.

19      Q.    Okay.  If you could turn the page to MS 310?

20      A.    Yes.

21      Q.    In the middle there's an online ACH to Keith

22  for a thousand dollars.  What is that for?

23      A.    That I do not know offhand.

24      Q.    Is that an advance on salary?

25      A.    I don't know whether that would have been a --

91

1  no.  Well, it may have been a rent payment.  I just am

2  not sure.

3      Q.  So why would that rent payment -- if that was a

4  rent payment, why would it be made to Keith when you

5  said the house was owned by Pak and she was the one

6  entitled to the rent?

7      A.  Well, this was an online transfer, and that may

8  have been the only account that we could get it

9  transferred into.

10     Q.  Okay.  Let's turn the page then to MS 312 or a

11  couple pages.

12     A.  Yeah.

13     Q.  Another $2,000 ACH to Keith, same account

14  number dated March 12 for 2,000.  What would that be

15  for?

16     A.  I think again that's rent.  I think if I'm

17  recalling now, there was a couple of rent payments that

18  we missed in, let's see, 2012.  No, no.  This was --

19  wait a minute.  We're in 2012 here.  Just a minute.  Let

20  me get my head straight on this.  2012.  I thought we

21  were in 2013.  Offhand, I don't know what that -- I

22  thought we were in 2013, and now I find out we're in

23  2012.  So --

24     Q.  Let's just make it clear.  I mean we're in

25  March of -- in February of 2012, you've got an ACH to

John McLeod
May 16, 2016

1   Keith for 1,000, and then in March of 2012, you've got a

2   $2,000 ACH, but if I recall from your testimony earlier,

3   Pak didn't purchase the house --

4       A.   Right.   That's why I say when I was looking at

5   the previous --

6       Q.   They couldn't be for rent, could they?

7       A.   No.   When I was looking at the previous

8   statement, I thought we were in 2013 since that's where

9   we had been a minute ago.

10      Q.   Okay.   So these can't be for rent though?

11      A.   No, no.

12      Q.   So any other idea what it may be for?

13      A.   Not off -- I just don't remember.

14      Q.   If you could turn to MS 316, please.   If you

15  could identify the source of the two deposits located in

16  the middle of the page, the large ones?   There's one

17  that's April 16 for 15,027 and one that's April 17 for

18  10,000.

19      A.   My -- well, we're in 2012 here now.   So okay.

20  I think the -- I think the $15,000 was the payment from

21  Direct Floral, and the 10,000 was a payment from CMS.

22  Well, I may be wrong on that too here.   I just don't

23  recall because Direct Floral would have been back in

24  2011.   So the 15,027 was probably a payment from CMS

25  because there would have been some miscellaneous

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    expenses sometimes added on there.  And the $10,000

2    deposit, I'm not sure what that was for.

3         Q.   If you could turn to MS 335, please.

4         A.   Okay.

5         Q.   Could you identify the source of the two

6    deposits, 3,575 and 5,000?

7         A.   What month is this?  August 2012.  The 3,575,

8    August 2012, I know that at some point in there I did

9    some work for Air Parts and billed them for it, and that

10   may have been what it was.

11             The $5,000 deposit, I don't know.  I mean there

12   were several customers at this time or potential

13   customers, and somewhere in there, we started working

14   with Nanotronics, and they may have given us a deposit.

15        Q.   Is it possible the 3,575 was the check --

16        A.   Oh, yes, yes.  That's the check that we

17   discussed earlier, yes.

18        Q.   Okay.

19        A.   Jumping back and forth like this makes it very

20   confusing.

21        Q.   I understand.  I'll try to be more clear on

22   what date we're on when the statements come in as

23   exhibits.

24             Just real briefly, let's take a side track to

25   Nanotronics.  Who is Nanotronics, and what were you

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    doing for them?

2        A.    They were developing a system for detecting

3    errors in integrated circuit wafers if you know what I'm

4    talking about.

5        Q.    Could you possibly put that in layman's terms?

6        A.    They had a camera which took really high

7    resolution pictures, and they were supposed to match a

8    certain pattern, and Keith and I were writing software

9    to see if the pattern matched what it should match.

10       Q.    Did you originate Nanotronics as a customer, or

11   did Keith?

12       A.    No.   Keith did.

13       Q.    I'd like to turn your attention back to MS 336

14   which is the next page.

15       A.    Okay.

16       Q.    $8,000 check paid out from Mwagusi on

17   August 22, 2012, what would that have been for?  Is it

18   possible that's the check to Jeff Waickman for the

19   moving expenses?

20       A.    That's possible, but there was the direct

21   deposit that we looked at -- well, I think it was the

22   direct deposit that we looked at earlier.  It's really

23   hard to remember back that far, but it could have been

24   that.

25       Q.    If you could turn to MS 340, please.  On

95

John McLeod
May 16, 2016

1  October 22, there's a $2,199 charge to Bank of America.

2  What would that be for?

3       A.   Offhand, I don't know.

4       Q.   Do you have any personal accounts with

5  Bank of America?

6       A.   Yes, I do.  Not a checking account, but a

7  credit card.  Yeah.  It's a Visa MasterCard payment.  It

8  could have been something that I did.

9       Q.   Okay.  If you could turn to MS 348, the middle

10 of the page, December 17, 2012, there's a Discover

11 payment of $3,243.  What is that for?

12      A.   That's probably my Discover account.

13      Q.   Would you then reimburse the business for that

14 payment?

15      A.   Depends on what it was for.  I don't recall

16 offhand.  I know at one point I bought a desk for the

17 office, some office furniture, and I think I put it on

18 the Discover card.

19      Q.   All right.  I'm going to skip Exhibit 21.  I

20 spoke with the court reporter off the record previously

21 and let her know we were going to skip 21.

22           But keep the exhibits moving so they match the

23 tabs.

24      A.   Okay.

25      Q.   So we're skipping now to tab 22, which will

Atkinson-Baker Court Reporters
www.depo.com

1  also be Exhibit 22, which is MS 107 to 117.  So if we

2  could mark that as 22, please.

3          (Trustee's Exhibit 22 was marked

4      for identification.)

5  BY MR. ANDERSON:

6      Q.    So Mr. McLeod, do you recognize this as Mwagusi

7  Software's 2013 tax return?

8      A.    Yes.

9      Q.    Okay.  The compensation of officers, No. 7, is

10  identified as 18,839.  That's, in fact, your

11  compensation --

12      A.    Yes.

13      Q.    -- during that year?

14      A.    Yes.

15      Q.    Why did it go down significantly?

16      A.    Well, I believe if I recall right, early in

17  2013, we finished up the CMS project, and so we didn't

18  have that income coming in.  And then we had -- we were

19  going to start another project with Pegasus as CMS

20  finished up, but the Superstorm Sandy that year --

21  Pegasus was working with a company back on the

22  East Coast, a relocation company, and Superstorm Sandy

23  that year had flooded a bunch of their warehouses; so

24  they didn't have -- they weren't ready to convert to the

25  Pegasus software.  And so we had to -- we had four or

97

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  five months there where we were committed to do this

2  project, but it didn't start when we wanted it to.  So

3  we had little or no income for those few months.

4      Q.   So, in the beginning of 2013, that's when CMS

5  stopped paying either a 14,500 or $15,000 monthly flat

6  fee?

7      A.   Yes.

8      Q.   Okay.  So then the salaries and wages, line 18,

9  16,287, was that for Keith Yerian?

10     A.   Yes.

11     Q.   Was that the only income he would have made

12  from Mwagusi in 2013?

13     A.   Yes.  As far as I know.  Basically, he's never

14  been paid anything except through the payroll except for

15  the first year.

16     Q.   If you could turn to MS 112, is that your K-1

17  for 2013?

18     A.   Yes.

19     Q.   And so you reported income of $467?

20     A.   Yes.

21     Q.   Okay.  If we could turn to MS 116, which is the

22  itemized deductions totaling almost $51,500, looking at

23  line 10, legal and professional fees of 14,111, what

24  would those be for?

25     A.   Those were the legal fees associated with the

1  lawsuit up in Ohio.

2      Q.    Travel and entertainment expenses, 13,265, what

3  would that be for?

4      A.    We did make a trip at some point during the

5  year as I recall down to Puerto Rico again, and we met

6  down there with -- I believe we met with the woman from

7  Pegasus.  And then we also -- I think we had a trip to

8  Ohio and to -- for a final meeting with CMS.  I'm trying

9  to recall.

10      Q.    What would the trip in 2013 have been to Puerto

11  Rico?

12      A.    Oh, the woman who runs Pegasus was going to be

13  down in Puerto Rico, and so we decided to meet down in

14  Puerto Rico is my recollection.

15      Q.    What's in Puerto Rico?  Was it a resort?  A

16  house?

17      A.    It was an apartment place.  Condo type place.

18      Q.    Was it an apartment that Keith Yerian owned?

19      A.    I don't know, but I think it may be.

20      Q.    Can you give us the date, please, of when that

21  trip would have been?  I don't recall hearing you say

22  that.

23      A.    I don't recall.  It may have been in the

24  summer.  July, thereabouts.

25      Q.    So then would you have paid Mr. Yerian a rental

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1 fee to rent his apartment or condo while you were there?

2    A.    No.

3    Q.    The portion of 13,265 that was attributable to

4 the Puerto Rico trip, what would have been included in

5 there as far as expenses?

6    A.    Airfare, food, any other travel expenses,

7 rental car, things like that.

8    Q.    Would that have been -- you know, airfare,

9 food, expenses, travel expenses, that would be for you

10 and for Mr. Yerian?

11    A.    Yes.

12    Q.    Did that also include his wife?

13    A.    Yes.

14    Q.    Can we have Trustee's tab 23 marked as

15 Exhibit 23, please.  This is for the record MS 64 and

16 65.

17        (Trustee's Exhibit 23 was marked

18    for identification.)

19 BY MR. ANDERSON:

20    Q.    Do you recognize Trustee's 23, Mr. McLeod?

21    A.    Yes.  It's an unemployment report.

22    Q.    Okay.  And is this for Mr. Yerian?

23    A.    Yes.

24    Q.    Okay.  Did Mr. Yerian file for unemployment

25 benefits during -- from Mwagusi during 2013?

100

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    A.   Yes.

2    Q.   What caused him to, I guess, be terminated

3  during 2013 that would have entitled him to unemployment

4  benefits?

5    A.   That was the Superstorm Sandy thing that I

6  referenced earlier.  The project was supposed to

7  start -- I forget the exact date, but it got delayed for

8  several months.

9    Q.   So then did you terminate him because there was

10 no work?

11   A.   Yes.

12   Q.   Did he ask that you terminate him so that he

13 could receive unemployment benefits during this time?

14   A.   No.  I just said there's no money coming in.

15 So I can't pay anybody, and I think I advised him to

16 file for unemployment.

17   Q.   Did you ever formally terminate his employment?

18   A.   Not with a formal letter of termination, no.

19   Q.   So was there any -- what was the date I guess

20 that he was no longer employed by Mwagusi Software?

21   A.   I don't know.  My recollection is that the

22 project was supposed -- the Pegasus project was supposed

23 to start in the spring, and it didn't get started until

24 September or October.

25   Q.   Would that be 2014?  Let me withdraw.

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1             Was the Pegasus project supposed to start in

2     the spring of 2014 but it then started in October of

3     2014?

4         A.   No.  It was supposed to start in the spring of

5     2013 is my recollection, and it didn't get started until

6     four or five, six months later.

7         Q.   Okay.  Which would have been what?  Like

8     September of 2013?

9         A.   Right.  Right.  My recollection is that we

10    actually started working in October.

11        Q.   Okay.  So this unemployment statement is during

12    September of 2013.  So you would have started -- you

13    would have rehired him soon after this?

14        A.   Right, right.  In October or November.  I don't

15    recall which one exactly.

16        Q.   Can you repeat the time line one more time,

17    please?  We're unclear as to when he stopped working,

18    when the benefits were paid, and then when you started

19    working, rehired him for the Pegasus project.

20        A.   Okay.  The spring -- again, my recollection, I

21    hope I've got the year right.  In the spring of 2013, we

22    were supposed to start a project with Pegasus software.

23    And because of the Superstorm Sandy thing, that didn't

24    get started until roughly October.  And during that time

25    or sometime in there, I told Keith we weren't going to

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  have any money to pay him; he should file for

2  unemployment.  I don't know exactly what date he filed.

3  It's in the records probably right here somewhere.  But

4  I don't recall it off the top of my head.

5      Q.   So then sometime in October or November of 2013

6  is when you started working with Pegasus, and then now

7  there was money to pay you and Keith again out of the

8  business?

9      A.   Yes.

10     Q.   Was there ever a formal, I guess, you know,

11  rehiring him or bringing him back on board, or was it

12  just, "Hey, we have work again.  Why don't we start

13  working, and I'll pay you a salary again"?

14     A.   No.  It was understood when the project got

15  delayed that there was a definite thing we knew about

16  that they were going to be coming back and wanting the

17  work done.  We didn't know the exact date.  But so we

18  were committed to -- we had already committed to do the

19  work; so it wasn't a question if there was anything iffy

20  about, you know, he was going to get rehired.

21         MR. ANDERSON:  Okay.  Can I have Trustee's tab

22  24 marked as Exhibit 24, please.

23         (Trustee's Exhibit 24 was marked

24     for identification.)

25

103

Atkinson-Baker Court Reporters
www.depo.com

1    BY MR. ANDERSON:

2        Q.   Please take a second, Mr. McLeod, to review

3    these.  This is MS 140 through MS 148.

4        A.   Uh-huh.

5        Q.   Okay.  What do you recognize Trustee's 24 to

6    be?

7        A.   An Expense Report.

8        Q.   Expense Reports starting January 2013 and going

9    all the way through December of 2013; is that correct?

10       A.   Yes.

11       Q.   Okay.  So starting on MS 140 --

12       A.   Yes.

13       Q.   -- Grant, Florida to Akron, Ohio, Mr. Yerian

14   took a trip to visit CMS in Akron, Ohio?

15       A.   Yes.

16       Q.   What about the next day, local travel to CMS?

17   What is that from?

18       A.   That's the -- I assume that's the mileage

19   expense from where he was staying to CMS.  He had his

20   car there.

21       Q.   Well, right.  So he drove from Grant, Florida

22   to Akron, Ohio, and then the next day he drove from

23   Akron to CMS; is that accurate?

24       A.   Yes, yes.  That he went --

25       Q.   Okay.  What about on January 8, local travel to

104

Atkinson-Baker Court Reporters
www.depo.com

1    attorney office?  What would that be for?

2        A.   That was for the attorney related to the

3    lawsuit up to Ohio.

4        Q.   Okay.  Turning back to -- turning to the next

5    page, MS 140 -- 141.  Excuse me -- looks likes we have

6    pretty much the exact same pattern, Grant to Akron,

7    local to CMS, and then to Nanotronics, then to his

8    attorney, then CMS, then back home.

9        A.   Yeah.

10       Q.   So would it have been common for him to make

11   the exact same route two months in a row?

12       A.   Yes.  We had a lot of stuff going on with the

13   attorney that he in particular had to be involved in.

14       Q.   Turning then to page 142, again, the same idea,

15   Grant to Akron, local travel, local travel, and then

16   back home during the same six-day period.  Do you

17   believe these are real expenses filed by Mr. Yerian?

18       A.   As far as I recall, they are.

19       Q.   Okay.  Then turning to 143, which is the

20   Expense Report for March of 2013, Grant to Atlanta,

21   Georgia.  What was in Atlanta at that time?

22       A.   That was Pegasus.

23       Q.   Then I'd like to turn to MS 147, please.

24       A.   Okay.

25       Q.   Can you contrast 147 with 148 and let me know

John McLeod
May 16, 2016

1  when you've had a second to review it?

2      A.   Okay.  They look substantially identical.

3      Q.   Right.  Would you agree with me that they're

4  actually identical except the only difference is that

5  November has been changed to December on 148?

6      A.   Yeah.

7      Q.   Okay.  Who is on 148 local travel to Wooster?

8      A.   Well, the first one, the November one, was for

9  a pretrial meeting with the attorney, and the

10  December one was for the actual trial that was held.

11      Q.   So the Ohio litigation had a trial during that

12  time period December 14th to December 20th?

13      A.   Yes.

14      Q.   Did you attend the same events during November

15  and December of 2013?

16      A.   I was at the trial.  I don't remember whether I

17  was at the attorney meeting in November.

18      Q.   Did you submit these same Expense Reports?

19      A.   No.  I would have had a flight to Ohio involved

20  and things like that.

21      Q.   Okay.  Did Mr. Yerian then pick you up at the

22  airport?

23      A.   Yes.

24      Q.   Any reason why he would have driven and you

25  would fly when it's likely that the expenses of driving

Atkinson-Baker Court Reporters
www.depo.com

1    would have been significantly higher than the expenses

2    of flying?

3         A.   For one thing, I know he had a lot of documents

4    that he had to cart back and forth.  In some of the

5    cases, he could actually go to visit other customers

6    easily.  And he had family back there too he could stay

7    with.  So it kind of reduced the cost that way.

8              MR. ANDERSON:  Can we move on to Trustee's 25,

9    please?  Have that marked as -- tab 25 marked as

10   Trustee's 25, which is MS 351 through 398.

11             THE WITNESS:  Okay.

12             (Trustee's Exhibit 25 was marked

13        for identification.)

14   BY MR. ANDERSON:

15        Q.   Just give me a second.  If you could turn,

16   please, to MS 353.

17        A.   Okay.

18        Q.   Looking at January 1st in the middle of the

19   page, there's a $62 charge to Brevard County Tax, and

20   this is -- again, looking at the bottom, this is on the

21   credit card used by Keith Yerian.  What would that $62

22   charge have been?

23        A.   I don't know it offhand.  I don't know what

24   kind of taxes are applicable in Florida.

25        Q.   Do you know whether Mr. Yerian resides in

107

John McLeod
May 16, 2016

1    Brevard County?

2         A.    No, I don't.

3         Q.    Again, you see a pattern of a series of

4    restaurants located -- identified on Mr. Yerian's

5    statement.  Can you take a look?  This is for January of

6    2013.  Is it your recollection that he would have been

7    visiting customers?

8         A.    Yeah.  That was for the trips to the attorney

9    and CMS at that time.

10        Q.    Okay.  Let's go to then 355, MS 355.

11        A.    Okay.

12        Q.    I'm going to ask you first about your charges

13   which start on February 5th.  There's a series of

14   charges that end in PR, PRI, from February 5th to

15   February 11th.  Were those charges incurred during --

16   while you were in Puerto Rico?

17        A.    Yes.

18        Q.    Would these have been your expenses as part of

19   being in Puerto Rico during that time?

20        A.    Yes.

21        Q.    Turning then to 357, MS 357, at the bottom,

22   from February 10 to February 15 on Keith Yerian's

23   account, you'll notice again a variety of charges in

24   Puerto Rico.  Were these on that same February 2013

25   Puerto Rico trip?

108

John McLeod
May 16, 2016

```
1        A.    Yes.

2        Q.    And this would have been that trip that you

3   were entertaining the lady from Pegasus?

4        A.    I believe so.  I know that she did come down on

5   one of the trips.

6        Q.    Just had a couple other charges on this page.

7   Going back up towards the top, there's the $777 charge

8   that Mr. Yerian expensed on US Airways.

9        A.    Yes.

10       Q.    What would that have been for?

11       A.    That would have been travel to Puerto Rico, I

12  believe.

13       Q.    Okay.  Then there's additional charges in

14  Puerto Rico from February 1st through -- well,

15  essentially just February 1st.  Are there any reasons

16  that he would have charges during that time?  Actually,

17  withdraw that.  Give me a second to look at this.

18            Do you see the charges that start on

19  February 1st --

20       A.    Yes.

21       Q.    -- to Puerto Rico?

22       A.    Yes.

23       Q.    And then there are a significant amount of

24  charges between February 4th and February 8th in Ohio,

25  and then there are additional charges in Puerto Rico.
```

John McLeod
May 16, 2016

1      A.   Yeah.

2      Q.   Was he there twice in Puerto Rico?

3      A.    As I recall, we were down in Puerto Rico, and

4  he had to go back to Ohio to meet with -- it was either

5  Nanotronics or CMS.  And so he flew back to Ohio.

6      Q.   So then during that time he was in Ohio, he

7  spent $24 at Guitar Center on February 5th.  What would

8  that have been for, and how would that have related to

9  Mwagusi?

10     A.   That I don't know offhand.

11     Q.   So then the charges at the end of the month,

12  February 10 to February 15, is that -- that's also in

13  Puerto Rico.  Is that part of the same trip with the

14  lady from Nanotronics?

15     A.   I believe so, yes.

16     Q.   The charges that start February 9 to

17  February 15, would those have been related to the lady

18  from Pegasus?

19     A.   I believe so, yes.

20     Q.   Okay.  Turning to 361, please.  On March 1st,

21  there's an $850 Budget Rent-a-car in San Juan.  Is that

22  also related to the Puerto Rico trip with the lady from

23  Pegasus?

24     A.   I believe so.

25     Q.   How long did that trip last?

John McLeod
May 16, 2016

1     A.   The trip itself was maybe two weeks when we

2 were all there, and then there was a time -- again, I

3 can't say exactly, but I know on some of these trips,

4 Keith liked to spend more time in Puerto Rico.  So he

5 would stay after the rest of us left, and in some cases

6 for several months.

7     Q.   So this $850 rental car charge, would that have

8 been related to his personal expense, or would that have

9 been for the company?

10     A.   That sounds like it would have been what he --

11 for car rental that he had when the company was there

12 because I believe -- again, I don't recall exactly, but

13 I believe he stayed for several more months.

14     Q.   But you don't have any charges during -- on

15 this same statement in Puerto Rico during this time.  Is

16 there a reason that you didn't have any charges there

17 and they're all on Keith's card?

18     A.   This may have been because I had left, and I

19 don't remember what date I left on.

20     Q.   Let me withdraw.  I was looking at the wrong

21 statement.  Strike the last question.  I withdraw that

22 question.

23     A.   Okay.

24     Q.   Okay.  Can we turn to MS 363, please?

25     A.   Okay.

111

1    Q.    There's a charge at the Super H Mart for

2  $148.74 on Mr. Yerian's card.  Do you see that?

3    A.    Yes.

4    Q.    Do you happen to know whether or not Sun Yo Pak

5  has a property in Suwanee, Georgia or somewhere around

6  there?

7    A.    No.  That was on -- on a trip to visit Pegasus,

8  and Keith stayed with a friend of Sun Yo Pak's, and in

9  lieu of paying for a hotel room, he bought some

10 groceries for them for meals while they were there.

11   Q.    In general though, do you happen to know

12 whether or not Sun Yo Pak owned a property in Georgia?

13   A.    No.  I have no idea.

14   Q.    Let's turn to MS 367, please.

15   A.    Okay.

16   Q.    There's a $520 charge to Mr. Yerian for

17 Allstate on May 14th, 2013.  What would that have been

18 for?

19   A.    I don't know exactly.  It may have been for

20 some kind of a car repair, but I'm not sure.  Or may

21 have been for car insurance.

22   Q.    Okay.  Would Keith's car insurance have been

23 something that Mwagusi Software would have paid?

24   A.    Not directly, no.

25   Q.    What do you mean not directly?

112

John McLeod
May 16, 2016

1     A.   I mean he would have gotten paid indirectly

2  through mileage; so --

3     Q.   So you wouldn't expect Mr. Yerian to charge his

4  personal car insurance to Mwagusi Software?

5     A.   No.

6     Q.   Okay.  If he had, would you have expected him

7  to pay that money back to the company?

8     A.   Yes.

9     Q.   Do you happen to know whether or not this

10 Allstate charge was ever reimbursed to the company?

11    A.   No.  Not offhand, I don't.

12    Q.   Turn to MS 375, please.  Let me know when

13 you're there.

14    A.   Okay.

15    Q.   Starting at the bottom of 375, there are some

16 charges in Georgia, and they carry over to MS 377 at the

17 top, and then they go from Georgia, North Carolina, all

18 the way up to Ohio, Pennsylvania.  Would those have been

19 on a trip to visit CMS?

20    A.   Yes, I believe so.

21    Q.   Let's turn to MS 379, please.

22    A.   Okay.

23    Q.   On July 19th, Ken Pollock Auto GRO.  What would

24 that have been for?

25    A.   I do not know.

113

1    Q.   What about the charge underneath it, JMD

2  International, $184?

3    A.   I don't know again.

4    Q.   Okay.  Let's turn then to MS 383, please.

5    A.   Okay.

6    Q.   This is a statement from October 2013, and it

7  starts back on August 20, 2013.  At the bottom of the

8  page are additional charges for Mr. Yerian in Puerto

9  Rico.  What would Mr. Yerian have been doing in

10 August 2013 in Puerto Rico on behalf of Mwagusi

11 Software?

12   A.   Like I said, we met down in Puerto Rico.  I

13 thought it was in the summer sometime of 2013; so that

14 might have been it.

15   Q.   So you testified earlier that there was a

16 previous trip in early 2013, and the statement supported

17 that, that that was entertaining the Pegasus woman.  So

18 what would be the purpose of this trip to Puerto Rico in

19 August of two thousand -- October of 2013?

20   A.   Just a minute here.  August -- well, it would

21 have been at the very least Keith and I to meet on

22 projects we were working on.

23   Q.   So did you fly to Puerto Rico as well in August

24 of 2013?

25   A.   I don't know.  I mean I can't recall.  But it

114

Atkinson-Baker Court Reporters
www.depo.com

1   looked like the kind of stuff -- the kind of charges

2   that would have occurred when I was down there with

3   Keith.

4       Q.   Okay.  Let's go to MS 389, please.  Are you

5   there?

6       A.   Yes.

7       Q.   Okay.  In the middle of that under Mr. Yerian's

8   charges, there's a flight purchased.  It looks like it's

9   on Korean Airlines for $1,526.74.  What would that be

10  for?

11      A.   Sun Yo Pak's father was killed in an automobile

12  accident, and I allowed her to use the card to fly back

13  to Korea.

14      Q.   Were you reimbursed for that expense?

15      A.   I think I may have withheld rent payments at

16  some point, but I'm not -- I can't recall exactly how

17  that worked.

18      Q.   Was that trip purchased for just Sun Yo Pak, or

19  did Mr. Yerian go as well?

20      A.   No.  It was just for her.

21          MR. ANDERSON:  Okay.  Let's have Trustee's tab

22  26 introduced as -- or marked as Exhibit 26, please.

23  For the record, MS 437 through MS 486.

24          (Trustee's Exhibit 26 was marked

25      for identification.)

115

John McLeod
May 16, 2016

1   BY MR. ANDERSON:

2       Q.   On MS 437, Mr. McLeod, there's deposits of

3   6,000 and 5,900.

4       A.   I believe that was from Nanotronics.

5       Q.   Those were Nanotronics payments?

6       A.   Yes.

7       Q.   What was your fee arrangement with Nanotronics?

8       A.   Mwagusi was going to be paid $6,000 a month for

9   Keith and I to work on this pattern recognition

10  software.

11      Q.   Did you say Aderant?

12      A.   Pattern.   Pattern recognition software.

13      Q.   Pattern.

14      A.   Yeah.   Detecting the flaws in the integrated

15  circuits.

16      Q.   Those were both Nanotronics payments?

17      A.   No.   The one 5,900 as I recall was from Air

18  Parts for some work I did over at their place.

19      Q.   And then that last deposit, any idea, the

20  1,253?

21      A.   Not offhand.

22      Q.   Okay.   Let's skip to 441.   Can you please

23  identify the sources of the two deposits located in the

24  middle of the page?

25      A.   I think one of them may have been Nanotronics.

116

John McLeod
May 16, 2016

1  And I think the 8,888 was Nanotronics, but -- and I

2  don't know what the 6,190 was.

3      Q.   Okay.  Let's move onto MS 445, please.  Just

4  the same question as to the two deposits, the 8,888 and

5  5,000.

6      A.   Again, I think 8,888 was Nanotronics.  I think

7  we arrived at some other figure adjusted above the

8  6,000, but I don't recall exactly why.

9      Q.   And the 5,000?

10     A.   Again, I don't recall what that was for.

11     Q.   Okay.  Let's skip to MS 451, please.  Same

12 question as to the deposit of $6,786 and -- we'll just

13 do that one.  Do you have MS 451, Mr. McLeod?

14     A.   No, I don't.

15     Q.   I'm sorry.  Okay.  This is one -- the Bates

16 actually skip because this statement was produced later,

17 or it was produced out of order.  So, for reference,

18 you'll have to keep going, 449, 450, and then it jumps

19 to 463, 464, 465.

20     A.   Okay.  Now I'm at 451, yes.

21     Q.   Sorry about that.  Mr. McLeod, are you at MS

22 451?

23     A.   Yes.

24     Q.   The source of the $2,000 deposit, please?

25     A.   That was a transfer from the savings account.

117

John McLeod
May 16, 2016

1      Q.    The 6,786?

2      A.    That's probably a Nanotronics.

3      Q.    Okay.  MS 455, please.

4      A.    Okay.  I'm there.

5      Q.    Deposit identified at the bottom of $6,678?

6      A.    That looks like Nanotronics again.

7      Q.    Okay.  Thank you.

8      A.    And again, I'm not sure about these without

9  actually seeing the copies of checks that were

10  deposited.

11      Q.    Understood.  Okay.  Let's go to MS 471, please.

12      A.    Okay.  I'm there.

13      Q.    There's a $10,000 deposit on September 10th.

14  What would that be for?

15      A.    That was Pegasus.

16      Q.    So is this when Pegasus became a client?

17      A.    Yes.  As I recall.

18      Q.    Approximately September of 2013?

19      A.    Yes.

20      Q.    What was your fee arrangement with them?

21      A.    They would pay us $10,000 a month for 13 months

22  and then $20,000 when we finished the project.

23      Q.    How long were they supposed to pay you the

24  $20,000 a month?

25      A.    10,000 a month.

118

John McLeod
May 16, 2016

1    Q.   So 10,000 a month for 13 months and then
2  starting at 20,000 a month for how long?
3    A.   Just one month.  That was a final payment on
4  completion of the project.
5    Q.   So if you turn to 475, MS 475.
6    A.   Okay.
7    Q.   Do you see there's two $10,000 deposits, one on
8  October 1st and one on October 23rd?  Are those both
9  from Pegasus?
10    A.   Yes.  And I think one was made early.
11    Q.   Okay.  And then MS 483, there are also two
12  $10,000 deposits.  Same idea?
13    A.   Let me go look and see.  Probably the same
14  thing, yeah.  Yeah, yeah.
15    Q.   All right.  So you've mentioned a couple of
16  times the Ohio litigation.  Who brought the cause of
17  action in Ohio and against whom?
18    A.   Keith's ex-wife brought the action against
19  Mwagusi, Keith, Sun Yo Pak, Robert Messner, and myself.
20    Q.   Okay.  What were the claims against Mwagusi
21  Software?
22    A.   That basically that we had taken customers of
23  Keith's former company ETC Computers and --
24    Q.   What were the claims against you?
25    A.   That I had received a valuable customer list

119

Atkinson-Baker Court Reporters
www.depo.com

1    and conspired -- I guess conspired to take business from

2    ETC Computers who was out of business.

3        Q.    Okay.  So Mwagusi Software defended that action

4    in Ohio?

5        A.    Yes.

6        Q.    Okay.  Who paid the legal fees for Mwagusi

7    Software, Keith Yerian, and yourself?

8        A.    Mwagusi Software did.

9        Q.    Okay.  The legal fees paid on your behalf, did

10   you reimburse the company for those personally?

11       A.    No.

12       Q.    The legal fees that the company paid on behalf

13   of Keith Yerian, did he reimburse the company for those

14   fees?

15       A.    No.

16       Q.    So if this was a lawsuit that was brought by

17   Keith's ex-wife, why would the company -- withdraw that.

18            Why didn't the company expect Mr. Yerian to

19   reimburse him for his legal expenses?

20       A.    Well, the lawsuit was a result of my having

21   worked with Keith as part of Mwagusi Software.  And so

22   it was kind of impossible to separate, you know, what --

23   separate the legal fees of each individual person.  They

24   were all together.  We met with the attorneys together

25   and everything else.

120

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    Q.   So you felt responsible to pay for Keith Yerian

2  since essentially he brought Mwagusi Software all the

3  business?

4    A.   Well, he didn't bring all the business, but I

5  felt like if Mwagusi Software didn't exist, the whole

6  lawsuit would have never been filed.

7    Q.   Okay.  So at this point in -- what is this?

8  What time period is this lawsuit being filed in?

9    A.   My recollection is that it was in 2012.

10    Q.   Okay.  So at this time from -- you had

11  Nanotronics as a customer; right?

12    A.   I don't remember exactly when we got them as a

13  customer.  It may have been --

14    Q.   But even time frame aside, Nanotronics was a

15  customer brought to Mwagusi Software by Keith Yerian?

16    A.   Yes.

17    Q.   Okay.  CMS was a customer by this point?

18    A.   Yes.

19    Q.   That was another customer brought to Mwagusi

20  Software by Keith Yerian?

21    A.   Yes.

22    Q.   Okay.  Direct Floral was a company that was a

23  customer of Mwagusi Software at the time of that Ohio

24  litigation?

25    A.   That was over with by the time the litigation

121

Atkinson-Baker Court Reporters
www.depo.com

1  started.

2      Q.   Okay.  But it was a customer prior -- it was a

3  customer of Mwagusi prior to the Ohio litigation.

4      A.   Yes.

5      Q.   And that was a customer referred by Keith

6  Yerian?

7      A.   Yes.

8      Q.   So I think you testified earlier that you

9  brought in Air Parts International.

10     A.   Yes.

11     Q.   Was that prior to the Ohio litigation?

12     A.   Yes.

13     Q.   Okay.  So were there any other companies or

14  customers that you originated or brought to Mwagusi

15  Software before the Ohio litigation other than Air Parts

16  International?

17     A.   Nothing that I recall.  Nothing of any

18  significant amount certainly.

19     Q.   Do you have reason to believe or were you aware

20  that Nanotronics was a prior customer of ETC Computers?

21     A.   No.  It was my understanding that they were not

22  a customer of ETC Computers.

23     Q.   Okay.  What about CMS?

24     A.   CMS --

25     Q.   Did you have any knowledge or belief that they

122

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1   were a customer of Mwagusi -- I'm sorry -- of ETC
 2   Computers prior to them working for or becoming a
 3   customer of Mwagusi Software?
 4        A.   Yes.  They were the only customer that we
 5   worked with as far as I know that had been a customer of
 6   ETC.
 7        Q.   So Direct Floral to your knowledge was never a
 8   customer of ETC Computers?
 9        A.   Not from what I was told.
10        Q.   Okay.  So Keith Yerian just to be clear never
11   reimbursed Mwagusi Software for any of the legal
12   expenses that were paid during the Ohio litigation?
13        A.   No.
14        Q.   Okay.  Has Mwagusi Software ever paid for Keith
15   Yerian's legal expenses in any other cases other than
16   the Ohio litigation?
17        A.   No.  There hasn't been any other cases that I
18   know of.
19        Q.   All right.  I'm going to skip Exhibit 27 and
20   just mark that as -- we're not going to introduce that
21   one.
22             So we're going to move on to Trustee's tab 28.
23   If we could have that marked as Exhibit 28, please.  So
24   this is for the record a document entitled Settlement
25   Agreement and General Release KY 1525 to 1527.
```

123

John McLeod
May 16, 2016

```
 1            (Trustee's Exhibit 28 was marked
 2       for identification.)
 3  BY MR. ANDERSON:
 4       Q.   Have you ever seen this document before,
 5  Mr. McLeod?
 6       A.   Yes.
 7       Q.   What do you recognize this document to be?
 8       A.   It's a Settlement Agreement.
 9       Q.   Is this of the Ohio litigation that we had been
10  discussing?
11       A.   Yes.
12       Q.   Okay.  It says in the first paragraph that --
13  actually starting second paragraph, A, that "Defendants
14  have filed Counterclaims in that action."  Which
15  defendant filed counterclaims?
16       A.   I think all of us did.
17       Q.   What was the basis of those counterclaims
18  against Debbie Yerian -- or Deborah W. Yerian and ETC
19  Computers?
20       A.   I am trying to recall the exact legal basis,
21  but I think basically that she was filing a claim when
22  she had no valid legal grounds to file a claim.
23       Q.   Okay.  So looking at paragraph 1, it says,
24  "Defendants will pay Deborah W. Yerian the sum of
25  $12,000."
```

124

John McLeod
May 16, 2016

1          And then continuing on to 1526, John McLeod

2   personally guarantees payment of $7,000.

3          Why did you guarantee payment of $7,000?

4     A.   The total sum settled for was 19,000, and we

5   had -- or I had $12,000 that I could pay right at that

6   time, and then they wanted my personal guarantee that

7   the other amount would be paid, the 7,000.

8     Q.   So did you personally pay the 12,000?

9     A.   Yes.

10    Q.   Was that paid from Mwagusi?

11    A.   No.   That was paid from my personal account.

12    Q.   Why didn't you pay that one from Mwagusi?

13    A.   Mwagusi didn't have any money.

14    Q.   Looking at page 1527, the version that we have

15   is unsigned by you.   Did you, in fact, sign this

16   agreement?

17    A.   Yes, I did.

18    Q.   Okay.   What were the claims against Robert

19   Messner in this action?

20    A.   I never understood that since he had never had

21   anything to do with Mwagusi Software.   I'd only met him

22   once.

23    Q.   Up until -- well, the agreement was signed

24   looks like by Deborah Yerian on February 11th, 2014.   So

25   prior to that date, had Mr. Yerian ever made

125

1  representations to you or anyone else that he would file

2  bankruptcy after this case was resolved, the Ohio

3  litigation?

4      A.   No.

5      Q.   He never made any statement to you about his

6  intent to file bankruptcy?

7      A.   Not that I can recall.

8      Q.   Okay.  I've mentioned it a couple times.  We

9  should probably address it.  Had you heard of a company

10 called ETC Computers?

11     A.   Had I heard of that company?

12     Q.   Yes.

13     A.   Yes.

14     Q.   What do you know ETC Computers to be?

15     A.   They were a company that Keith I believe had

16 ownership of when he worked for Yellow Pages Exchange

17 because the payments were made to ETC Computers.

18     Q.   Do you know what ETC Computers used to do?

19     A.   Computer software development as far as I know.

20     Q.   Did Mr. Yerian ever discuss with you forming

21 Mwagusi Software so he could continue to provide

22 services to the customers of ETC Computers without -- or

23 by having them not continue to be ETC Computers'

24 customers?

25     A.   No.

126

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1     Q.    Let me withdraw that.  That wasn't worded very

2  well.

3           Did Mr. Yerian ever address with you his

4  intention to start Mwagusi Software to divert the

5  customers from ETC Computers?

6     A.    No.  It was my idea to start Mwagusi Software.

7     Q.    And then to service the customers that used to

8  be ETC Computers' customers?

9     A.    The idea was to do software development.  I did

10  not care at all about ETC Computers' customers.

11     Q.    So you started Mwagusi Software, but did you

12  know who the customers were going to be at the point

13  that you started this software development company?

14     A.    The only ones that I knew were Direct Floral

15  and CMS to start with.

16     Q.    Did you know that CMS was ETC's customer at the

17  time that you started doing work for them or that had

18  been a customer of ETC Computers?

19     A.    I didn't know for sure.  I was -- I was aware

20  that Keith was involved there somehow, but I didn't

21  know -- I don't know what their contractual relationship

22  with ETC was.

23           MR. ANDERSON:  All right.  Let's have Trustee's

24  tab 19 marked as Exhibit 29, please.

25           (Trustee's Exhibit 29 was marked

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      for identification.)

2   BY MR. ANDERSON:

3      Q.   Mr. McLeod, I know it's like 1:30 your local

4   time.  Do you need to take a break to grab some food, or

5   do you want to take a break?

6      A.   I'm okay.

7           THE COURT REPORTER:  I need to take a break for

8   the bathroom, but if you want to get to the end of this

9   exhibit, that's fine.

10          MR. ANDERSON:  I'll try to pick up the pace so

11  we can get out of here.  So all right.  We'll go through

12  Exhibit 29.  So can we have that marked, please?

13     Q.   So for the record, Exhibit 29, Trustee's 29, is

14  MS 126 through 135.  Do you recognize this document,

15  Mr. McLeod?

16     A.   Yes.

17     Q.   What do you recognize it to be, please?

18     A.   Tax return.

19     Q.   For Mwagusi Software for 2014?

20     A.   Yes.

21     Q.   All right.  So compensation of officers, line

22  7, it shows nothing now.  Did you stop paying yourself

23  an officer's salary at some point?

24     A.   No.  I made a mistake when I filled out the

25  form.

128

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      Q.    Have you amended the return?

2      A.    No.

3      Q.    Why haven't you amended the return?

4      A.    I didn't think it was necessary.  From what I

5  understand, in the situation that I am in where I am the

6  owner and the officer and everything, it isn't really

7  relevant.  It's not going to change the amount of tax

8  owed.

9      Q.    Did you, in fact, take officer compensation

10 during 2014?

11     A.    I took a salary.

12     Q.    So looking at line 8, there's $47,146 of salary

13 and wages.  Is that for you and Mr. Yerian?

14     A.    Yes.

15     Q.    Is there anyone else included in there?

16     A.    No.

17     Q.    All right.  Let's turn to MS 131, please.

18 You'll see line 5 has $35,462 of legal and professional

19 fees as a deduction.

20     A.    Yes.

21     Q.    Was that exclusively related to the Ohio

22 litigation?

23     A.    I believe that was almost entirely related to

24 the Ohio litigation.

25     Q.    But that wouldn't have included the settlement

1   payments to Deborah Yerian.  That's just the legal

2   expenses?

3       A.   I don't know.  It may have included the

4   settlement.

5       Q.   But that settlement was paid by you personally;

6   right?

7       A.   Yes.  But then the -- the settlement was not

8   paid by me personally.  I took personal money, invested

9   it into the company and as a -- as a capital investment,

10  and then wrote checks out of the company to pay for the

11  settlement.

12      Q.   Okay.  The travel and entertainment expense of

13  7,924, what is that for?

14      A.   Again, we traveled to Puerto Rico again in

15  2014, and it would have been some travel to Pegasus.

16      Q.   So that during the 2014 Puerto Rico trip, when

17  would that have been?

18      A.   I don't recall again.

19      Q.   What was the purpose of the trip?

20      A.   I think we met again with Pegasus.

21      Q.   Okay.  Where did you stay when you were there?

22      A.   That trip, we stayed in a condo in San Juan.

23      Q.   Would that be the condo that Mr. Yerian's

24  retirement account owns in San Juan?

25      A.   I believe so.

Atkinson-Baker Court Reporters
www.depo.com

1    Q.   Did you pay Mr. Yerian any rental fee as part

2  of staying there in 2014?

3    A.   No, no.

4         MR. ANDERSON:  I think that's it for that

5  exhibit.  Let's take a quick break for as long as the

6  court reporter needs.

7         (Recess.)

8         MR. ANDERSON:  All right.  Let's have Trustee's

9  binder tab 30 marked as Exhibit 30, please.  For the

10  record this is MS 487 through 534.

11        (Trustee's Exhibit 30 was marked

12     for identification.)

13  BY MR. ANDERSON:

14    Q.   Mr. McLeod, do you recognize these documents?

15    A.   Yes.

16    Q.   And they're credit card statements for Mwagusi

17  Software?

18    A.   Yes.

19    Q.   Okay.  Turning your attention to MS 489, there

20  are a couple of charges that Mr. Yerian has, Auto Zone

21  and Firehouse Garage.  Do you recognize what those are

22  for?

23    A.   I do not.

24    Q.   Is it possible that they're for his auto car

25  expenses?

131

John McLeod
May 16, 2016

 1     A.    Certainly the Auto Zone sounds like that.

 2     Q.    Is that something that Mwagusi would have

 3  expected Mr. Yerian to have expensed?

 4     A.    No.  Not -- no.

 5     Q.    Would you have expected him to reimburse an

 6  Auto Zone charge for, you know, repairs to his personal

 7  vehicle?

 8     A.    Yes.

 9     Q.    Do you know whether he did reimburse that Auto

10  Zone -- I'm sorry -- the Auto Zone or Firehouse charges?

11     A.    No, I don't.  And I mean $13 was kind of a

12  small -- or whatever, $33.00, whatever it was.

13     Q.    You forget the one for 197.

14     A.    I don't know what Firehouse Garage is.  Could

15  be a garage.  Could be a restaurant for all I know.

16     Q.    Okay.  Turning to MS 495, please.

17     A.    Okay.

18     Q.    On one of your charges, Louis Mo, DDS, for

19  $760.  What would that be for?

20     A.    That was a dental expense on my part.

21     Q.    Okay.  Is that part of as you testified before

22  you can charge a certain amount of medical expenses to

23  the company within reason?

24     A.    Yes.

25     Q.    So you didn't reimburse those for the company?

1    A.    No.

2    Q.    If you could turn to MS 499, please.

3    A.    Okay.  I'm there.

4    Q.    There's a charge for you on April 7 to that

5    same party, Louis Mo, DDS, for $630.  Is that another

6    dental expense for you?

7    A.    Yes.

8    Q.    Is that still within this amorphous amount of

9    medical expenses you can charge without reimbursing the

10   company?

11   A.    Yes.

12   Q.    Can you please turn to 505?  These are expenses

13   for Mr. Yerian.  Any idea what Discount ASP.net is for

14   $320?

15   A.    That's a technical service that we use in

16   programming.

17   Q.    Okay.  What about Alltech Water Co. for 300?

18   A.    That I don't know.

19   Q.    Do you find it troubling that there are a lot

20   of expenses on the Mwagusi credit card that you can't

21   identify where they came from and where they were

22   expensed?

23        MR. WOLFF:  Object to the form of the question.

24        You can answer.

25

133

John McLeod
May 16, 2016

1   BY MR. ANDERSON:

2       Q.   Would you like me to repeat it?

3       A.   Are you repeating the question?

4       Q.   I can.  Do you find it troubling that there are

5   a number of charges that we've identified for Mr. Yerian

6   that you don't know what they're for or whether they

7   were reimbursed to the company?

8       A.   Kind of yes and no.  You know, most of them are

9   not for large amounts of money, No. 1.  And No. 2, is

10  that I'd have to investigate in detail to find out what

11  they actually were.

12      Q.   All right.  What about the Jet Blue charge for

13  $654?

14      A.   I assume that was for a trip of Puerto Rico.

15      Q.   Turning to MS 507, there's a charge for you for

16  Delta, June 15th, to looks like San Juan.  Is that the

17  2014 trip to Puerto Rico that we discussed earlier?

18      A.   I think so, yes.

19      Q.   All right.  Turning to MS 509, Mr. Yerian's

20  charges, there are two to a Mark Peterson, DMD.  Are

21  those Mr. Yerian's dental expenses?

22      A.   I believe so.

23      Q.   And that's within reason for him to charge to

24  the --

25      A.   Yes.

134

Atkinson-Baker Court Reporters
www.depo.com

1      Q.    -- company credit card?

2      A.    Yes.

3      Q.    Turn to, please, page MS 513.

4      A.    Okay.

5      Q.    Starting on June 19th -- this is Mr. Yerian's

6   card -- there are a series of transactions in Puerto

7   Rico that go from June 20th to looks like July 8th.

8   Would that have been the approximate time frame of the

9   2014 Puerto Rico trip?

10     A.    That sounds about right.

11     Q.    Okay.  On July 14th, there are two charges to

12   Bay Street Optical, one for 435 and one 870.  Are

13   those --

14     A.    Medical expense.

15     Q.    -- for Mr. Yerian's vision plan with the

16   company or reimbursement of --

17     A.    Reimbursement of medical expenses, yeah.

18     Q.    And that's within reason that the company will

19   allow?

20     A.    Yes.  Yes.  You know, anything up to maybe

21   $5,000 in a year would be allowable.

22     Q.    Okay.  Looking at MS 527, please.

23     A.    Okay.

24     Q.    November 12, Mr. Yerian charges $95 for Florida

25   license/tag.  Do you have any idea what that would be

135

John McLeod
May 16, 2016

```
 1  for?
 2      A.    Reading that, I would assume it's for a license
 3  plate.
 4      Q.    Would that be something that you would expect
 5  to pay or something Mwagusi Software would expect to
 6  pay?
 7      A.    No.
 8      Q.    Is that something you would expect Mr. Yerian
 9  to reimburse to the company?
10      A.    Yes.
11      Q.    Do you know whether or not he reimbursed for
12  that charge?
13      A.    I don't know.
14      Q.    And this month too I notice that you only have
15  one charge for $15, but Mr. Yerian has many.  Is that
16  because you weren't doing any work that required
17  expenses for Mwagusi during this time?
18      A.    There was a period of time where I wasn't doing
19  any work for Mwagusi.  So that may have been part of it.
20      Q.    So Mr. Yerian was continuing to work for the
21  company?
22      A.    Yes.  There was a period of time where we were
23  supporting Pegasus, and it was stuff that he had more
24  knowledge of than I did.  So I think I actually took
25  myself off salary for a while.
```

136

1      Q.    That was going to be my next question.   What

2    was this period of time where you weren't working for

3    Mwagusi anywhere?

4      A.    I don't recall.   It was -- the best I can

5    recall is it was from sometime late in 2014 to sometime

6    I think December of 2015.

7      Q.    Okay.   And do you recall whether or not you

8    were still paid your salary during that time?

9      A.    No, I was not.

10     Q.    Okay.   When did you turn the salary back on?

11     A.    December of 2015.

12     Q.    Okay.   Any reason in particular?

13     A.    The work that had to be done involved stuff

14   that I needed to do.

15     Q.    Okay.   If you could turn to MS 533, please.

16     A.    Okay.

17     Q.    This is a Keith Yerian charge on December 12

18   for Turbotax for $90.   Do you expect that to be

19   Mr. Yerian's charge for his taxes for that year?

20     A.    I suspect it was.   I don't know.   I suspect it

21   was.

22     Q.    Is that something that the company would

23   generally pay?

24     A.    No.

25     Q.    Okay.   Did Mr. Yerian reimburse the company for

Atkinson-Baker Court Reporters
www.depo.com

1    that charge?

2        A.    Not that I know of.

3        Q.    Okay.   Another charge on the bottom at Auto

4    Zone.   Same idea, you wouldn't expect that to be

5    something that the company would cover?

6        A.    Not just offhand looking at it, Auto Zone, no.

7             MR. ANDERSON:   Okay.   Let's move on to

8    Trustee's tab 31 which is for the record MS 571 to 618.

9    Can we have that marked as Trustee's 31, please?

10            (Trustee's Exhibit 31 was marked

11       for identification.)

12   BY MR. ANDERSON:

13       Q.    Looking at the first page, 571, this is for

14   January of 2014.   Can you identify the source of the

15   15,000 and $10,000 deposits, please?

16       A.    I believe those came from Pegasus.

17       Q.    What about the $3,000 one?

18       A.    That I think came from First Watch.

19       Q.    Who is First Watch?

20       A.    They're another customer that wanted some work

21   done.

22       Q.    Is this an account that was originated by

23   Mr. Yerian or yourself?

24       A.    Kind of both of us.   Originally Mr. Yerian had

25   been contacted by John Martin.   We talked about this

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

 1   very early, and then I had met with John Martin and

 2   billed them $100, $120 for assessing their website.  And

 3   then three years later, they came back to us and said

 4   they wanted to do some work on their website, and so

 5   that's what we were doing.

 6        Q.   If you could turn to 572, please.  Looking at

 7   check 1611 that was paid by Mwagusi in the amount of

 8   $15,000, who would you have paid $15,000 and for what

 9   purpose?

10        A.   $15,000.  This was in January 2014.  I would

11   have to see the check to tell you.  I can't recall what

12   it was offhand.

13        Q.   All right.  I'm going to skip forward quite a

14   bit here.  If you could skip forward to MS 596, please.

15        A.   Okay.

16        Q.   Let me know when you're there, please.

17        A.   Okay.  I'm here.

18        Q.   Okay.  Electronic withdrawal to Macy's, $281.

19   Would that have been for you or Mr. Yerian?

20        A.   That was probably for me.

21        Q.   Is Mwagusi or I guess during the rest of 2014,

22   would Mwagusi have continued to get $10000-a-month

23   payments from Pegasus?

24        A.   No, no.  It was erratic amounts after that.

25        Q.   Are you still receiving payments to date, or

139

Atkinson-Baker Court Reporters
www.depo.com

 1  did that stop at some point, the payments from Pegasus?

 2       A.   We're still receiving payments based on the

 3  work that we do.

 4            MR. ANDERSON:  Okay.  I'm going to skip tab 32

 5  and move on to tab 33.  If we could have tab 33 marked

 6  as Trustee's 33, please, which is MS 731 through 810.

 7            (Trustee's Exhibit 33 was marked

 8  for identification.)

 9  BY MR. ANDERSON:

10       Q.   Before I get into these checks, I'm going to

11  back up a second.  Were you aware that Mr. Yerian filed

12  bankruptcy on or before February 27, 2015?

13       A.   No.  Somewhere along the line, he mentioned

14  that he was going to file bankruptcy, but I never -- I

15  never knew the exact dates or anything.

16       Q.   When would he have first made those statements

17  to you?

18       A.   Maybe about the beginning of 2014.

19       Q.   Did he ever tell you that he did file?

20       A.   I think not until considerably after he had

21  done it.

22       Q.   Did he ask that you change his payroll or

23  expenses in any way relating to or as a result of his

24  filing bankruptcy?

25       A.   No.  His payroll remained constant the entire

                                                         140

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  time.

2      Q.    Okay.  Let's turn now to Trustee's 33.  These

3  are copies of the checks produced by Mwagusi.

4      A.    Yeah.

5      Q.    I see the first 731, MS 731 is signed by Laura

6  McLeod.  Is that your wife?

7      A.    Yes.

8      Q.    What is her role in Mwagusi Software?

9      A.    Nothing really.  She just has signature

10 authority on the account.  So if I were unavailable.

11     Q.    She never received a paycheck from Mwagusi?

12     A.    No.  No.

13     Q.    Okay.  The next two which are 732 and 733, are

14 these checks that you paid to Sun Pak for rent?

15     A.    Yes.

16     Q.    Okay.  Turning to 734, this is a check dated

17 October 15 payable to Custom Mover Services for $500.

18 They were your customer; correct?

19     A.    Yes.

20     Q.    So why are you paying Custom Mover Services

21 $500?

22     A.    Keith owed, I guess, the Custom Mover Services

23 some money for -- they had loaned him some money is my

24 understanding, and he asked if I would make repayment to

25 them on his behalf and then he would repay me later.

141

John McLeod
May 16, 2016

```
 1       Q.    Do you know why he owed Custom Mover Services
 2   money?
 3       A.    I think he was short of money at one point and
 4   borrowed some money from them.  I'm not 100 percent
 5   certain.
 6       Q.    Are you talking about like an advance for
 7   services?  He took an advance on services to be
 8   performed for CMS?
 9       A.    No.  This is just basically a loan from Mwagusi
10   to Keith, and he's going to have to pay it back.
11       Q.    How much was the principal of the loan?
12       A.    I thought it was -- he told me it was like
13   $15,000.
14       Q.    Is Dean Barker the principal of CMS?
15       A.    Yes.  As far as I know.
16       Q.    Okay.  If there are any checks in here in this
17   exhibit that are payable to Sun Pak for a thousand
18   dollars, can we assume that those are rent checks?
19       A.    Yes.
20       Q.    All right.  Looking to 736, which is a check
21   from Mwagusi to Sun Pak for $2,200 and for, quote,
22   expenses, what expenses was the company reimbursing Sun
23   Pak for?
24       A.    When was this dated?  10/30/14.  I think that
25   was for some expenses that she incurred down in Puerto
```

 1   Rico when we were there, and I didn't have any money to

 2   pay her at one point.  Repay her.

 3        Q.   What type of expenses did she front you while

 4   you were down there?

 5        A.   She bought some food and paid some other

 6   expenses for expense of being there.

 7        Q.   Why didn't you or Mr. McLeod -- you or Mr.

 8   Yerian use the company credit cards as you had done

 9   frequently in the past?

10        A.   I don't recall why we didn't do that.  I think

11   she went out and did this while we were working on stuff

12   and didn't have a credit card.  So she put it on her

13   account, and then we reimbursed her.

14        Q.   Would she have submitted receipts to you for

15   that?

16        A.   At one point she did, yes.

17        Q.   Okay.  So turning to 738, March 14th check --

18   I'm sorry -- March 2014 for looks like rent office -- I

19   can't read the first word -- and then November,

20   December.

21        A.   Oh, yeah.  There's one point where we didn't

22   pay rent for a while, and then we caught up on it.

23        Q.   Is that because the company was having cash

24   shortfalls?

25        A.   Yes.  That would have been cash shortfalls that

Atkinson-Baker Court Reporters
www.depo.com

1  time.

2       Q.   Okay.   Turning to MS 746, this is a check dated

3  December 31st to CMS for $1,500, and it says November,

4  December, January in the memo line.   Is that three

5  months of payments on that loan --

6       A.   Yes.

7       Q.   -- from CMS to Mr. Yerian?

8       A.   Yes.

9       Q.   And turning to 748, another $500 check,

10 February 12, 2015, to CMS, is that another loan

11 repayment?

12      A.   Yes.

13      Q.   Turning to MS 750, is that another repayment of

14 that loan?

15      A.   Yes.

16      Q.   And turning to 752, is that another repayment?

17      A.   Yes.

18      Q.   All right.   Turning to 755 --

19      A.   Same thing.

20      Q.   -- is that another payment on that loan?

21      A.   Yes.

22      Q.   And turning to 757 --

23      A.   Yep.

24      Q.   -- is that another repayment of that loan?

25      A.   Yes.

John McLeod
May 16, 2016

1      Q.    Are you there, sir?

2      A.    Yes.

3      Q.    I'm sorry.  I didn't hear your answer.  Is that

4  another repayment on that loan?

5      A.    Yes.

6      Q.    What's the current balance on that loan?

7      A.    Just off the top of my head, I would guess it's

8  about 8 or $9,000.

9      Q.    Do you have any kind of a ledger or anything

10  where you're keeping track of what's owed and the

11  principal balance?

12      A.    I had some notes that I made, but you know, I

13  haven't got it with me.  I could figure it out.

14      Q.    Okay.  Turning to 761, please, this appears to

15  be a check for Mwagusi Software from Pegasus.

16      A.    Yes.

17      Q.    Who signed the signature line on that check?

18      A.    Gigi Libretto.

19      Q.    Who is she?

20      A.    She's the owner of Pegasus.

21      Q.    Was Pegasus an account that you originated or

22  Keith?  I'm just trying to keep it straight.

23      A.    I think originally, I mean it came -- I had

24  something to do with originating it, but Keith being

25  involved in the moving industry knew about Pegasus when

145

John McLeod
May 16, 2016

1  I didn't.  So -- but then we did a little job for her at

2  one point, and we both worked on that, and I guess she

3  got to like us.

4       Q.   Looking at 767, another $500 payment to CMS, is

5  that another payment on that loan?

6       A.   Yes.

7       Q.   Looking at 771, please --

8       A.   Okay.

9       Q.   -- it's a check from Mwagusi to Reed Yodor for

10  $5,439, and the memo line says Final Payment Yerian,

11  et al. What was that check for?

12      A.   That was the final payment for the litigation

13  back in Ohio.

14      Q.   Was that for legal fees or to go to Deborah

15  Yerian?

16      A.   For legal fees.

17      Q.   772, please.

18      A.   Okay.

19      Q.   It looks like a check from Mwagusi Software to

20  WHMH.  What is that for?

21      A.   Oh, that was a payment to Frank Wolff.

22      Q.   Was that check paid to WHMH on behalf of

23  Mr. Yerian or on behalf of Mwagusi?

24      A.   On behalf of Mwagusi.

25      Q.   Who's Franchise Tax Board?

```
 1      A.    That's the California state tax agency.

 2      Q.    So if you could turn to Mwagusi 782, please.

 3      A.    Okay.

 4      Q.    Actually, I'm sorry.  786.  This is a payment

 5  it looks like to Franchise Tax Board, September of 2014

 6  for 2011 tax LLC fee.  Is there any reason you paid it

 7  three years later?

 8      A.    Because I didn't realize that I had to pay it.

 9  I didn't realize when I -- I thought the company was set

10  up in Nevada, and then Paychex filed a report

11  incorrectly, and it showed my home address.  And so the

12  state of California came after me saying that you're

13  operating in California.  So you better pay us $800 a

14  year.

15      Q.    Okay.  Turning to 787 --

16      A.    Same thing.

17      Q.    -- is that for the loan?

18      A.    Yes.

19      Q.    MS --

20      A.    Yes.

21      Q.    -- 789, please.  It's a check to Sun Pak for

22  $880 for mileage for Atlanta trip, and I think it says

23  AUG for August.

24      A.    Yeah.  Right.

25      Q.    What was this check for?
```

147

John McLeod
May 16, 2016

1     A.    For mileage expenses.

2     Q.    What was Sun Pak doing on behalf of Mwagusi in

3  Atlanta?

4     A.    It was her car that was used to go.

5     Q.    Is there any reason you paid it to her instead

6  of Keith other than it was her car?

7     A.    No.  It was her car.

8     Q.    Did Keith direct that you pay that check to

9  her?

10     A.    He asked that I would pay it to her because he

11  explained it was her car.

12     Q.    Okay.  791 and 792, are these two additional

13  payments on that same loan to CMS?

14     A.    Yes.

15     Q.    And same with 795?

16     A.    Yes.

17     Q.    Is Mwagusi Software expecting Mr. Yerian to

18  reimburse him for all -- or reimburse Mwagusi Software

19  for all of these $500 loan payments to CMS on his

20  behalf?

21     A.    Yes.

22     Q.    Have you discussed the terms of a repayment on

23  this?

24     A.    Not yet.  I mean until this whole bankruptcy

25  thing gets settled, I don't think he's in any position

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    to discuss paying anybody anything.

2           MR. ANDERSON:  Okay.  If we could have

3    Trustee's 34 marked, please.

4           THE WITNESS:  Yep.  I'm there.

5           (Trustee's Exhibit 34 was marked

6       for identification.)

7    BY MR. ANDERSON:

8       Q.   This is MS 796 through 804 for the record.

9    Mr. McLeod, do you recognize this document?

10      A.   Yes.  Tax return again.

11      Q.   Okay.  And Mwagusi Software made $90,522 in

12   2015?

13      A.   Yes.

14      Q.   And the salary and wages on line 8, $36,853, is

15   that split between you and Mr. Yerian?

16      A.   Yes.  30,000 of that was Keith, and the other

17   6,000 was mine.

18      Q.   Why is Mr. Yerian making so much more than you

19   at this point?

20      A.   Because the work that needed to be done didn't

21   require two people to do, and it didn't require my

22   particular skill set.

23      Q.   So each of you is taking the portion or

24   commission on the fee that you're originating and the

25   work that you're doing and paying it out --

149

John McLeod
May 16, 2016

1    A.   No, no, no.  It's based upon who has the

2  requisite skills to do the job.

3    Q.   Right.  So if Mr. Yerian is billing $20,000 to

4  a client, he's going to get a $20,000 payment or --

5    A.   No, no, no.  The payment from the client is

6  unrelated to Mr. Yerian's salary.  In other words, we

7  make a proposal to a client, and we get paid a certain

8  amount of money, but Mr. Yerian gets the same salary

9  regardless.

10    Q.   So what was your salary in 2015?

11    A.   I think I only had $6,000 worth there.

12    Q.   Did you have other income?

13    A.   Yeah.  I'm retired.  I've got Social Security,

14  and I've got a retirement fund from Jet Propulsion

15  Laboratory.

16    Q.   All right.  Let's turn to 804, please.

17    A.   Yes.

18    Q.   Line 2, legal and professional fees during 2015

19  is $17,518.  What is that for?

20    A.   That is primarily the payoff of the legal fees

21  for the trial in Ohio.

22    Q.   And the travel and entertainment expenses for

23  6,347, is that from the 2015 Puerto Rico trip?

24    A.   Yes.  And some trips up to Atlanta Keith made.

25    Q.   And Atlanta is where Pegasus is located?

150

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      A.    Yes.

2            MR. ANDERSON:   Okay.   Can we have Trustee's tab

3    35 marked as Exhibit 35, please?   We're working through

4    this.   We'll be done here pretty soon.

5            (Trustee's Exhibit 35 was marked

6        for identification.)

7    BY MR. ANDERSON:

8      Q.    Do you recognize Trustee's 35, which is MS 805?

9      A.    Yeah.

10     Q.    So this is what looks to be Mr. Yerian's 2015

11   Expense Report?

12     A.    Yes.

13     Q.    Is this custom for him to submit one Expense

14   Report for the entire year?

15     A.    Pretty much.   I mean we don't do a lot of

16   travel.

17     Q.    So earlier when we looked at his Expense

18   Reports, they were all broken down monthly?

19     A.    Yeah.

20     Q.    For 2015, he did it all at one time?

21     A.    Things are done differently at different times

22   depending on how busy stuff was and how much work is

23   going on.

24     Q.    All right.   Looking at it, so January 18th to

25   23rd -- that would have been during the beginning of

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1   2015 -- Mr. Yerian would have traveled to Atlanta and

2   incurred a $676 reimbursement, but you're telling me he

3   never asked to be paid that in advance?

4        A.   No.

5        Q.   So not in advance.  He never asked to be paid

6   that after it was incurred?

7        A.   He submitted the Expense Report, and I don't

8   remember whether we paid this Expense Report or not.  We

9   may still owe it to him.

10       Q.   You say you still owe the 2015 expenses to him?

11       A.   I might, yes.  I just don't recall writing a

12   check for that amount of money to Keith.

13       Q.   And so he submitted this on February 18 of

14   2015, but he's never asked that it be paid to him?

15       A.   Not directly, no.

16       Q.   And he's never followed up asking for payment?

17       A.   No.  Again, I don't know.  We might have paid

18   him.  I just don't know.  I mean, like I say, it may

19   still be owed to him.  We might have paid him.  We might

20   have paid him in a couple of different increments, but

21   off the top of my head, I don't know.

22            MR. ANDERSON:  Okay.  Let's have tab 36 marked

23   as Trustee's 36 which for the record is MS 619 through

24   662.

25            (Trustee's Exhibit 36 was marked

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      for identification.)

2   BY MR. ANDERSON:

3      Q.   Let me know when you're ready.

4      A.   We're ready.

5      Q.   Okay.  Let's see.  Looking at MS 621, there are

6   two $102 charges to Mark Peterson, DMD.  Are those

7   medical expenses for Mr. Yerian?

8      A.   Yes.

9      Q.   All right.  I didn't hear your response.

10     A.   I said yes.  Apparently the phone system is

11  cutting out a little bit here.

12     Q.   Well, bear with me if I repeat myself.

13     A.   Bear with me too.

14     Q.   Are those acceptable charges to Mwagusi?

15     A.   Yes.

16     Q.   Okay.  Does your wife have access to a Mwagusi

17  credit card?

18     A.   No, I don't believe she does.  I'm not sure

19  though.

20     Q.   If you could turn to MS 629, please.  Do you

21  see the charge for $679 with the name Laura McLeod under

22  it?

23     A.   Yes.

24     Q.   Does she have a Mwagusi credit card?

25     A.   Yes, I guess she does.  She doesn't use it very

John McLeod
May 16, 2016

1  often; so --

2      Q.    Okay.  Is she entitled to expense her medical

3  expenses as part of --

4      A.    Yeah.  Anybody in the family is entitled to get

5  the medical reimbursement.

6      Q.    Does Sun Pak have a credit card?

7      A.    You know, I thought I started to give her one

8  at one time, but I don't know whether she has it or not.

9  This is four or five years ago now.

10     Q.    Okay.  Well, you've gone through a significant

11  amount of these credit card bills with me at this point.

12  Are there any other credit cards that Mwagusi has?

13     A.    No.  That's the only credit card account that

14  Mwagusi has.

15     Q.    I'm sorry.  I didn't hear you.

16     A.    That's the only account that -- that's the only

17  credit card account that Mwagusi has.

18     Q.    Okay.  Can you please turn to MS 637.

19     A.    Okay.

20     Q.    I'm just going to read off a couple that appear

21  to be auto related, two Napa Auto Parts charges, a

22  European Toys, European Toys and Auto Zone.  Do you know

23  what those are all for?

24     A.    No, I don't.

25     Q.    Do you know whether Mr. Yerian has any European

Atkinson-Baker Court Reporters
www.depo.com

1  cars or did during April of 2015?  That would have been

2  April of 2015.

3      A.   No, I don't really.  I know at one time he had

4  a German car, but I don't know -- I don't know whether

5  he still has it.

6      Q.   Do you see at the bottom of 637 starting on

7  May 14th there are charges in what appear to be in

8  Puerto Rico?

9      A.   Yes.

10     Q.   Are they related to your trip to Puerto Rico in

11 2015?

12     A.   Yes.

13     Q.   We're trying to speed this up.  Just give me a

14 second.  I'm still taking the big ones.

15          Let's go on to Trustee's tab 37, please.

16     A.   Okay.

17     Q.   This is for the record MS 687 through MS 726.

18     A.   Okay.

19          (Trustee's Exhibit 37 was marked

20      for identification.)

21 BY MR. ANDERSON:

22     Q.   On page MS 691, there is a charge for --

23 deposit of $30,000 even.  What would that have been for?

24     A.   That would have been from Pegasus.

25     Q.   Sorry.  Do you recognize these to be the bank

Atkinson-Baker Court Reporters
www.depo.com

```
 1   statements -- checking account statements for Mwagusi
 2   during 2015?
 3        A.   Yes.
 4        Q.   And I am not going to enter Trustee's 38.
 5             So I just have a few questions, and our side
 6   will be wrapped up.
 7        A.   Okay.
 8        Q.   Have you ever heard of a company called
 9   Bglobal?
10        A.   Only as a result of the lawsuit up in Ohio.
11        Q.   All right.  How was Bglobal involved in the
12   Ohio lawsuit?
13        A.   They weren't as far as I know.  I mean they
14   were named.  Somebody asked me a question, if I knew
15   what Bglobal was, and I said, no, I'd never heard of
16   them, and that was the extent of it.
17        Q.   Okay.  Is Mwagusi still operating as of today?
18        A.   Yes.
19        Q.   What do you anticipate that it will gross in
20   2016?
21        A.   Let me think for a minute here.  I would say
22   roughly $100,000.  I don't expect to make a lot of money
23   this year.
24        Q.   And what is Keith's salary, I guess, as of
25   today?
```

156

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1     A.    $2,500 a month.

2     Q.    And yours?

3     A.    When I'm working, it's $2,500 a month.

4     Q.    Are you working currently?

5     A.    Yes.

6     Q.    All right.  Who are the customers that you're

7  actively doing -- that Mwagusi is actually doing work

8  for as of today?

9     A.    Pegasus.

10    Q.    Is that the only customer?

11    A.    Yes.  That's the only active customer.

12    Q.    Do you anticipate getting any additional work

13 from CMS in the near future?

14    A.    No.

15    Q.    Are you aware that this case has been set for a

16 trial on September 8, 2016?

17    A.    Frank Wolff mentioned that, yes.

18    Q.    Are you planning on attending the trial on

19 behalf of Mwagusi Software?

20    A.    I wasn't, no.  I have a conflict with that time

21 period.

22    Q.    Okay.  Do you remember receiving a Subpoena to

23 produce documents served to Mwagusi Software?

24    A.    Yes.

25    Q.    All the documents that have been produced by

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  Mwagusi Software, are you familiar with them?

2      A.   I think so.

3      Q.   Did you help assemble all the records on behalf

4  of Mwagusi Software that were produced in response to

5  that Subpoena and any subsequent request to produce?

6      A.   Yeah.  I was the only one that could.

7      Q.   Are the records that you produced on behalf of

8  Mwagusi either in response to the Subpoena or in

9  response to a request to produce, were they kept by

10 Mwagusi Software in the ordinary course of business?

11     A.   Yes and no.  We do most of our business

12 electronically.  So I depend upon, you know, being able

13 to go to the banks, Chase Bank online service and look

14 up things like credit card statements and checks and

15 stuff like that.  So, you know, I depend upon the bank.

16     Q.   Documents printed from the bank or at least

17 compiled into a producible form?

18     A.   I didn't hear the whole question.

19     Q.   Sure.  So you either printed these documents

20 that were produced or you produced them in an electronic

21 form, you know, to our office?

22     A.   Yeah.  I printed what I could, and then I went

23 to the bank and asked them what more I could get, and

24 they said they could get me I think three months of

25 data, and then after that, they were going to charge me

John McLeod
May 16, 2016

1  $3 per item.

2      Q.   Okay.  So these records that you've produced

3  whether they be expense reports, bank statements,

4  anything that you've produced, do you keep those records

5  contemporaneously with the work memorialized in those

6  records?

7      A.   No.  Not right now.  Everything got kind of

8  messed up after the trial in Ohio when we had to dig out

9  a bunch of stuff and try and provide it and everything

10  else.  And so I sent a bunch of the records up to Ohio

11  for that trial, and they sent some stuff back to me.  I

12  don't know whether I got it all back or not, but it came

13  back in a big box.  The records are in bad shape at the

14  moment.

15      Q.   But you reviewed all the documents that you

16  produced on -- you know, that you've produced to our

17  office whether in response to the Subpoena or the

18  request to produce?

19      A.   Yeah.  In the sense that I produced them.  I

20  didn't read every single line of every credit card

21  statement.

22      Q.   Sure.  So the bank statements, credit card

23  statements, tax returns, copies of checks, do you keep

24  those records in the ordinary course of Mwagusi's

25  business?

159

John McLeod
May 16, 2016

1      A.    I don't keep paper copies of them, no.

2      Q.    But in the course of your business, you would

3   keep those records?

4      A.    If I needed those records, I would go to the

5   bank and get the records.

6      Q.    Okay.  But you have personal knowledge of the

7   documents that are -- that you produced whether that be

8   the contents of them, you know, you could verify the

9   amounts or the bank statements, you know.

10      A.    Yeah.  Like I said, when you were asking the

11   other questions, there are a lot of things that I don't

12   remember since they occurred several years ago.  If I

13   could see the checks and things like that, I might be --

14   I'm sure I could identify what they were for.

15      Q.    So all the exhibits that we've reviewed today

16   which are, you know, essentially the documents that you

17   have produced, do they accurately depict the operations

18   of Mwagusi?  For example, did you notice any of the bank

19   statements that had incorrect charges?

20      A.    No, no.

21           MR. ANDERSON:  All right.  Frank, we don't have

22   any further questions.

23           MR. WOLFF:  No questions from this side, and

24   I've given the court reporter and I gave you guys three

25   exhibits.  The court reporter can discard them.  One

160

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1  document which is the Complaint in the Ohio litigation,

2  I'll Bates stamp that and give that to you guys.  Okay.

3         So I guess we're on for 9:00 o'clock tomorrow

4  morning at my house.

5         MR. WEBBER:  Yeah, your house.  I've never been

6  there, but first of all, is Mr. McLeod going to read or

7  waive?

8         MR. WOLFF:  We'll assert our rights to read.

9         MR. WEBBER:  Since he's not coming to trial,

10  we're going to need an original and a copy.  This is

11  Trustee Webber.  And I need a mini and a disk, and we're

12  going to need a copy.

13         MR. WOLFF:  We're not going to order a copy at

14  this time.

15            (Ending time:  2:30 p.m.)

16

17

18

19

20

21

22

23

24

25

John McLeod
May 16, 2016

```
1   STATE OF _____)
                              )  SS.
2   COUNTY OF _____)

3

4

5

6

7         I, the undersigned, declare under penalty of

8   perjury that I have read the foregoing transcript, and I

9   have made any corrections, additions or deletions that I

10  was desirous of making, that the foregoing is a true and

11  correct transcript of my testimony contained therein.

12        EXECUTED this ____ day of _____,

13  20___, at _____, _____.
                    (City)                  (State)
14

15

16

17

18

19                              _____
                                John McLeod
20

21

22

23

24

25
```

162

John McLeod
May 16, 2016

Atkinson-Baker Court Reporters
www.depo.com

1                    REPORTER'S CERTIFICATE

2

3

4          I, AMY PRATT, CSR No. 8709, Certified

5    Shorthand Reporter, certify;

6          That the foregoing proceedings were taken

7    before me at the time and place therein set forth, at

8    which time the witness was put under oath by me;

9          That the testimony of the witness, the

10   questions propounded, and all objections and statements

11   made at the time of the examination were recorded

12   stenographically by me and were thereafter transcribed;

13         That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15         I further certify that I am not a relative or

16   employee of any attorney of the parties, nor financially

17   interested in the action.

18         I declare under penalty of perjury under the

19   laws of California that the foregoing is true and

20   correct.

21         Dated this 31st day of May, 2016.

22

23                    _____

                      AMY PRATT, C.S.R. No. 8709

24

25

John McLeod
May 16, 2016

1          REPORTER'S CERTIFICATE OF CERTIFIED COPY

2

3

4

5

6

7          I, AMY PRATT, CSR No. 8709, a Certified

8   Shorthand Reporter in the State of California, certify

9   that the foregoing pages 1 through 163, constitute a

10  true and correct copy of the original deposition of John

11  McLeod taken on May 16, 2016.

12          I declare under penalty of perjury under the

13  laws of the State of California that the foregoing is

14  true and correct.

15

16          Dated this 31st day of May, 2016.

17

18

19          _____

20          AMY PRATT, C.S.R. No. 8709

21

22

23

24

25

John McLeod
May 16, 2016