# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

In re:                                    Bkr Case No. 6:15-BK-1720-KSJ

**KEITH A. YERIAN,**

**Debtor.**
_____/
**KEITH A. YERIAN.**
                                          **Case No. 6:17-CV-459-Orl-31**
**Appellant,**

**v.**

**RICHARD  B.  WEBBER,  II,  as
TRUSTEE,**

**Appellee.**
_____/

_____

## AMENDED[1] REPLY BRIEF OF APPELLANT
## KEITH A. YERIAN
_____

**Michael A. Nardella, Esq.**
**Florida Bar No.: 51265**
**Christian J. Graham, Esq.**
**Florida Bar No.: 94245**
**Nardella & Nardella, PLLC**
**250 E. Colonial Dr., Suite 102**
**Orlando, Florida 32801**
**Telephone (407) 966-2680**
mnardella@nardellalaw.com

_____

[1] Amended to ensure compliance with the Court's Order dated August 29, 2017.

cgraham@nardellalaw.com
**Attorneys for Appellant**

# TABLE OF CONTENTS

I.     Congress Specifically Delegated the Power to Determine the Full Scope of Exemptions in Bankruptcy to the States, Which Arrangement Has Been Deemed Constitutional…………………………………………………………………….3

II.    The Federal Statute and Florida Statute Differ Significantly Regarding the Effect of Tax-Exempt Status on Creditor-Exempt Status, and the Florida Statute Was Specifically Designed to Increase the Breadth and Power of the Exemption……...8

III.   Proper Application of § 222.21, *Florida Statutes*, Will Not Lead to Rampant Fraud As Appellant and Others in Similar Situations Face Extreme Penalties from the IRS…………………………………………………………………………...12

IV.    The Bankruptcy Court Order Is Not From the IRS Nor a Tax Court and the Decision Cannot be Both Subsequent and Prior to the Petition Date…………………….……………………………………………….…15

       CERTIFICATE OF COMPLIANCE……………………………...………………21

       CERTIFICATE OF SERVICE……………………………………………........22

i

# TABLE OF AUTHORITIES

**Cases**

In re Helsel, Sr.,
326 B.R. 591, 602  (Bankr. W.D. pa. 2005)…………………………………16, 17

In re Hughes
293 B.R. 528 (Bankr. M.D. Fla. 2003)…………………………………………...9

In re Lausch,
12 B.R. 55, 56 (Bankr. M.D. Fla. 1981)………………………………………….4

In re Snape,
172 B.R. 361, 364 (Bankr. M.D. Fla. 1994)……………………………………4, 5

In re Perez,
318 B.R. 742 (Bankr. M.D. Fla. 2005)………………………………………...….9

In re Willis,
424 Fed. Appx. 880, 880 (11th Cir. 2011)……………………………......…18

Matter of Rivera,
5 B.R. 313, 315 (Bankr. M.D. Fla. 1980)………………………………......17

Wyeth v. Levine,
555 U.S. 555, 589 (2009)……………………………………………….……4

**Statutes**

11 U.S.C. § 522(b) ................................................................. 4
11 U.S.C. § 522(b)(2)................................................................ 4
11 U.S.C. § 522(b)(3)(A) ........................................... 1, 3, 7, 12
11 U.S.C. § 522(b)(3)(C) ................................... 2, 8, 10, 16, 18
11 U.S.C. § 522(o)…………………………………………........6
11 U.S.C. § 522(p)…………………………………………….....6
25 U.S.C. § 4975………………………………………………13
26 U.S.C. § 408(e)……………………………………………..13
26 U.S.C. § 408(e)(B)………………………………......…….10
Florida Statutes Section 222.14…………………………….…..13
Florida Statutes Section 222.21 ……………………....1, 2, 3, 6, 7, 8, 10, 12, 16, 18
Florida Statutes Section 726.105…………………………….…14

**Other Authorities**

*Senate Staff Analysis and Economic Impact Statement* dated March 22, 2005…………………………………………………………..............9, 10
s. 401(a) of the Internal Revenue Code of 1986…………………………….10
s. 403(a) of the Internal Revenue Code of 1986………………………...........10

s. 403(b) of the Internal Revenue Code of 1986…………………………………….…10

s. 408 of the Internal Revenue Code of 1986……………….....................................10

s. 408A of the Internal Revenue Code of 1986…………………………………….…10

s. 409 of the Internal Revenue Code of 1986………….....................................10

s. 414 of the Internal Revenue Code of 1986…………....................................10

s. 457(b) of the Internal Revenue Code of 1986……………………………...…10

s. 501(a) of the Internal Revenue Code of 1986……………………………10

Tex. Const. art. XVI, § 50……………………………………………………….…5

*The Political Economy of Property Exemption Laws* dated 2001……………...........5

iii

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

In re:                                          Bkr Case No. 6:15-BK-1720-KSJ

**KEITH A. YERIAN,**

**Debtor.**

_____/

**KEITH A. YERIAN.**
                                                **Case No. 6:17-CV-460-Orl-31**
**Appellant,**

**v.**

**RICHARD B. WEBBER, II, as TRUSTEE,**

**Appellee.**

_____/

## REPLY BRIEF OF APPELLANT KEITH A. YERIAN

Distilled to its essence, Appellee's Answer Brief (Doc. 22) (the "Answer Brief") contains four arguments for why the Debtor's self-directed Individual Retirement Account (the "IRA") is purportedly not exempt from creditors pursuant to § 222.21, *Florida Statutes*, as incorporated by 11 U.S.C. § 522(b)(3)(A).  These arguments are as follows: (I) That Appellant's interpretation of the law restricting what tribunal can determine the effectiveness of the relevant exemption violates the Supremacy Clause and

1

other principles of federalism, although Appellee fails to mention that Congress specifically and voluntarily delegated this precise power to the states (Answer Brief at p. 12-14); (II) That § 222.21, *Florida Statutes*, is "clear and unambiguous" and identical to the federal exemption in 11 U.S.C. § 522(b)(3)(C), although Appellee fails to explain the meaning and purpose of the very different language added by the Florida Legislature in 2005, the purpose of which is outlined in the legislative history. (Answer Brief at p. 18-20); (III) That Appellant's interpretation of § 222.21, *Florida Statutes*, would lead to rampant fraud and windfalls for unscrupulous debtors, although Appellee ignores the fact that no such windfalls would exist because once the Internal Revenue Service ("IRS") eventually determines an account to have lost its tax-exempt status, the penalties are draconian, and certainly punishment enough. (Answer Brief at p. 27-31); and (IV) That the Bankruptcy Court's ruling on the exemption is retroactive to the date of the filing of the petition (the "Petition Date") and therefore is in fact simultaneously both a "subsequent" determination made after the Petition Date and a pre-existing final and non-appealable decision from before the Petition Date, although Appellee ignores both the policy decisions made by

2

the Florida Legislature together with the inherent logical inconsistency of this argument. (Answer Brief at p. 26-27).

## I. Congress Specifically Delegated the Power to Determine the Full Scope of Exemptions in Bankruptcy to the States, Which Arrangement Has Been Deemed Constitutional.

As reflected in Appellant's Initial Brief (Doc. 22), the gist of Appellant's position is that § 222.21, *Florida Statutes*, preserves an IRA account's creditor-exempt status unless and <u>until</u> a subsequent, final, and non-appealable determination is made that the account has lost its tax-exempt status, a decision intended for the IRS or Tax Courts. This position is supported by both the language of the statute and the legislative history behind the statute.

What is uncontroversial is that § 222.21, *Florida Statutes*, is incorporated by 11 U.S.C. § 522(b)(3)(A) into the Bankruptcy Code, which allows the individual states to decide whether to "opt out" of using federal exemptions and instead apply the state's own exemption scheme in local bankruptcies. Appellee, however, argues that to apply § 222.21, *Florida Statutes* as it was intended to be applied would be to improperly "divest" the Bankruptcy Court of the power to determine exemptions. (Answer Brief at p. 5-6), which would conflict with "principles of federalism" (Answer Brief at

3

p. 12-14), and violate the Supremacy Clause (Answer Brief at p. 13). In support of this argument, Appellee cites repeatedly to a concurring opinion in *Wyeth v. Levine*, 555 U.S. 555, 589 (2009), an inapposite case concerning pre-emption and the Supremacy Clause.

This issue, however, has been discussed head-on by local, lower courts. For instance, in *In re Lausch*, 12 B.R. 55, 56 (Bankr. M.D. Fla. 1981), *aff'd*, 16 B.R. 162 (M.D. Fla. 1981) the court stated that "[i]n enacting the opt out provision of § 522(b), Congress has again delegated to the states the task of determining bankruptcy exemptions." The court continued by saying that "[t]he only difference between the exemption scheme of the Bankruptcy Act and that provided in the Code is that each state legislature is presented a list of exemptions which it may enact for the benefit of its citizens or it may separately determine what property should be exempt." *Id.*

The bankruptcy court in *In re Snape*, 172 B.R. 361, 364 (Bankr. M.D. Fla. 1994) also ruled that the "delegation of power by Congress by creating the 'opt-out' provision is not an inappropriate delegation of federal power." The bankruptcy court went further, stating that "the enactment of § 522(b)(2), the opt-out provision, was nothing more than a long-standing

4

recognition by Congress of the existing exemption laws of the states" and that "[w]hat this Section did was nothing more than authorize the states to determine the extent of exemptions available to its citizens." *Id.* The bankruptcy court concluded that "[t]he retention of a power by a state is certainly an acceptable division of power between state and federal governments" and found the incorporation of Florida exemption law into the Bankruptcy Code to be constitutional. *See id.*

For better or for worse, Congress has voluntarily authorized the states to "determine the extent of exemptions," and that is exactly what Florida has done.    While Appellee may disagree with this delegation, and Congress could certainly repeal it, it is currently the law.  Nor does the delegation of power appear to be limited in any way.  The many states that have elected to "opt out" and have their own exemptions applied in bankruptcies have radically different exemption schemes. Eric Posner, Richard M. Hynes & Anup Malani, "The Political Economy of Property Exemption Laws" (John M. Olin Program in Law and Economics Working Paper No. 136, 2001).

To many, Florida's unlimited homestead protection is a travesty of justice, and only one other state, Texas, has a similar law. *See* Tex. Const. art. XVI, § 50. Nevertheless, Florida's homestead law is honored in

5

bankruptcy courts, even in situations where a debtor has a multi-million dollar homestead.   In fact, Florida's homestead law led to so many unjust situations that Congress did curtail its power slightly when it enacted 11 U.S.C. § 522(o) and (p), which created a limited exception to the exemption, but those subsections by no means eliminated it.

The upshot is that the states can choose whatever exemption scheme they please and that the exemption scheme so chosen is automatically adopted into the Bankruptcy Code, whether or not it seems fair.  If Congress feels that a state is abusing this privilege, it can, as it has before, specifically limit an exemption regardless of state law.   While Florida's homestead exemption has been expressly limited to curtail perceived abuses, § 222.21, *Florida Statutes*, has not been similarly curtailed and remains fully applicable to determine the scope of a Florida citizen's exemption.

Appellee takes issue with the Florida Legislature's decision to preserve the creditor-exempt status of an IRA account pending a subsequent ruling by the IRS or a Tax Court on an account's tax-exempt status. (Answer Brief at p. 14-18). Appellee believes that such a policy improperly divests a bankruptcy court of the power to fully determine exemptions. (Answer Brief at p. 14-18). This argument conflates the power to rule on exemptions,

clearly a core proceeding, with the power to set the boundaries of an exemption, which was delegated to the states in 11 U.S.C. § 522(b)(3)(A).

And this is how Florida has set the boundaries with IRA accounts: Florida has determined that only a subsequent, final, and non-appealable decision, intended for the IRS or Tax Courts, can operate to destroy the creditor-exempt status of an IRA account. Florida could have set the boundary elsewhere; for instance, it could have provided that IRA accounts are creditor-exempt until five years after an account loses its tax-exempt status, it could have provided that IRA accounts are creditor-exempt unless and until a panel of experts has determined that tax-exempt status has been lost, or it could have provided that IRA accounts, like annuities, are simply creditor-exempt regardless of tax-exempt status (there are many categories of exempt property in Florida where tax-exempt status is irrelevant). Regardless, Florida chose the limits contained in § 222.21, *Florida Statutes*, which, until Congress curtails it, no matter how allegedly distasteful, is both Constitutional and fully protects Appellant's IRA from creditors and trustees unless and until a <u>subsequent</u>, final, and non-appealable determination is made, a determination intended for the IRS or Tax Courts.

**II.  The Federal Statute and Florida Statute Differ Significantly Regarding the Effect of Tax-Exempt Status on Creditor-Exempt Status, and the Florida Statute Was Specifically Designed to Increase the Breadth and Power of the Exemption.**

In his Answer Brief, Appellee takes the position that the co-existing exemptions in 11 U.S.C. § 522(b)(3)(C) and § 222.21, *Florida Statutes*, are "substantively identical." (Answer Brief at p. 15).  It is true that the two statutes used to be substantially identical (although they were never substantively identical), but that in 2005 the Florida Legislature added language to § 222.21, *Florida Statutes*, creating a clear distinction.

Appellee urgently points to the fact that no on-point case law appears to exist supporting Appellant's position, but Appellee fails to note that no such case law appears to support Appellee's position either. (Answer Brief at p. 15). This is a case of first impression.

Appellee then asserts the unsupported legal conclusion that the language added to the statute in 2005 is irrelevant and that the two statutes remain "substantively identical." (Answer Brief at p. 14-18). Silence can be noteworthy, and the Answer Brief is entirely silent on what Appellee believes to have been intended by the language added in 2005.  Appellee simply ignores what cannot be explained, and his insistence that pre-2005

8

cases like *In re Hughes*, 293 B.R. 528 (Bankr. M.D. Fla. 2003) are still relevant underscores Appellee's contention that the additional language added in 2005 must be irrelevant. (Answer Brief at p. 18).

But the language added by the Florida Legislature in 2005 is not irrelevant—it creates an obvious distinction between the two statutes—and admittedly the scope of the difference is not clear, but the legislative history serves to clarify.   *See In re Perez*, 318 B.R. 742 (Bankr. M.D. Fla. 2005)(stating that "…when a statute is vague or ambiguous that other interpretative tools may be used, including an examination of…legislative history.").

According to the *Senate Staff Analysis and Economic Impact Statement* dated March 22, 2005, regarding CS/SB 660, the changes to the statute were intended "to **<u>increase</u>** the creditor protection afforded individual retirement accounts and tax-qualified employee benefit plans." *Id.* at p. 5 (emphasis added).   To accomplish this, the Florida Legislature decided to make all IRAs exempt from creditors regardless of whether or not tax-exempt status had been previously lost, at least until a final determination was made by the appropriate arbiter. *Id.* at p. 6.   As stated in the history, "[t]he key issue has often been whether the plan qualified for a tax-

9

exemption because [the previous] s. 222.21, F.S., requires that such a plan be tax-exempt in order to be exempt from creditor's claims." *Id* at p. *5.*

To fix this problem, the changes in 2005 "provide[d] an exemption from creditor's claims for any fund or **account** that is maintained in accordance with a master plan, volume submitter plan, prototype plan or other plan, or governing instrument that has been pre-approved by the IRS as tax-exempt under s. 401(a), s. 403(a), s. 403(b), s. 408, s. 408A, s. 409, s. 414, s. 457(b), or s. 501(a) of the Internal Revenue Code of 1986, as amended." *Id.* (emphasis added). This exemption can then only be "eliminated if a subsequent, final determination has been made . . . . [by] the IRS and Tax Courts . . . ." *Id.*

The problem which Florida sought to fix is really a question of timing. The problem was that in determining when tax-exempt status was lost, the IRS or a Tax Court will look to January 1 of the calendar year in which a disqualifying event occurred. *See* 26 U.S.C. § 408(e)(B). Therefore, if a disqualifying event occurred in mid-2015, tax exempt status is said to be lost retroactively as of January 1, 2015.

If tax-exempt status and creditor-exempt status are linked, as they are under 11 U.S.C. § 522(b)(3)(C), then under the above example, creditor-

10

exempt status would also be retroactively lost as of January 1, 2015 as well. If that date is prior to a petition date, then a debtor who filed bankruptcy with such an IRA would find no protection, which is exactly how it works under the Federal statute.

Florida, acting through the authority granted to it by Congress, greatly expanded the breadth of the exemption at issue to change this for the Florida statute.   Under Florida law, IRA accounts opened pursuant to an approved plan are creditor-exempt property, and unlike the federal exemption where an IRA account can lose its creditor-exempt status retroactively with the later determination of loss of tax-exempt status, the Florida exemption preserves creditor-exemption status regardless of whether tax-exempt status has been lost until a procedural condition is met, namely a subsequent, final, non-appealable determination is made regarding tax-exempt status by the appropriate arbiter.   This loss of creditor-exempt status is not retroactive to the date tax-exempt status is lost, but is only effective upon issuance of that final and non-appealable determination.

Therefore, under Florida law, there is a gap period in which an IRA account may have lost its tax-exempt status due to a disqualifying event but nevertheless temporarily preserves its creditor-exempt status unless and until

11

the determination is made, and final, and non-appealable. This interpretation is the only interpretation that can give meaning to the extra language added by the Florida Legislature in 2005. Appellee provides no contrary interpretation, but ignores the added language and cites to case law from before 2005. (Answer Brief at p. 14-18).

Pursuant to the new language, the IRA in the instant case may very well have lost its tax-exempt status due to disqualifying events (although it remains to be seen what the IRS will do since the transactions were *de minimis*), but its creditor-exempt status remains intact until that subsequent, final, and non-appealable determination is made. This increase in protection is within the scope of power delegated to Florida pursuant to 11 U.S.C. § 522(b)(3)(A) and designed to prevent exactly what Appellee is trying to accomplish.

**III.     Proper Application of § 222.21, *Florida Statutes*, Will Not Lead to Rampant Fraud As Appellant and Others in Similar Situations Face Extreme Penalties from the IRS.**

Appellee argues that the application of § 222.21, *Florida Statutes*, as intended by the Florida Legislature, would create a new vehicle to shield assets from creditors. (Answer Brief at p. 29). According to Appellee, would-be bankruptcy debtors would simply transfer their assets into IRAs,

promptly engage in self-dealing, disqualifying transactions, and then file bankruptcy before the IRS or a Tax Court can make a final determination, thereby protecting the assets from creditors. (Answer brief at p. 29-30).

The first thing this argument ignores is the simplest thing.  The eventual penalties levied by the IRS for disqualifying transactions are extreme.  First, in any year in which a disqualifying transaction is found to have occurred, the entire fair market value of the IRA is deemed to be ordinary income (not capital gains) to the account holder, and taxes on that income are then due. See 26 U.S.C. § 4975 and 26 U.S.C. § 408(e). Second, 15% of the value of the IRA is taken as a penalty for the disqualifying event and another 10% is taken as an early distribution penalty. See 26 U.S.C. § 4975 and 26 U.S.C. § 408(e). As an asset protection scheme, this is foolish in the extreme.

But this hypothetical also misses important alternatives.  There are many current vehicles in which would-be bankruptcy debtors can transfer assets to make them protected from creditors which carry no IRS baggage. For instance, Florida law protects annuities and life insurance cash surrender values. *See* § 222.14, *Florida Statutes*. These vehicles can provide complete

13

protection from creditors and are entirely unlinked from tax exemption and IRS penalties.

Moreover, any transfer of non-exempt property into exempt property within four years of filing for bankruptcy is subject to avoidance as a fraudulent transfer, regardless of whether transferred into an IRA account, an annuity, or a life insurance policy. *See* § 726.105, *Florida Statutes*. Transferring non-exempt property into an IRA account as an asset protection scheme, as proposed by Appellee, provides no benefit over other potential vehicles, but certainly provides enormous drawbacks.  There is no slippery slope here.

In fact, Appellant's financial situation is a perfect example.   If Appellant is successful in this appeal and the IRA is protected from creditors, the IRS or a Tax Court may nevertheless eventually determine that the IRA lost its tax-exempt status in 2014, at which point Appellant may be liable for ordinary income tax liability on the full, fair market value of the IRA, coupled with 25% in penalties and then potentially additional late fees and interest.  When all is said and done, there very well may be nothing left in the IRA and Appellant may still owe the IRS additional amounts which he must pay out-of-pocket.

14

But the situation for Appellant could be much, much worse. If Appellant loses this appeal and the IRA is administered by Appellee as Trustee, then Appellee will use the funds of the IRA to pay administrative expenses of the estate before the IRS as a creditor receives any distribution. In that situation, Appellant could effectively lose the entire balance of the IRA and still owe the enormous tax penalties for a disqualifying event. Instead of using the assets of the IRA to pay the taxes and tax penalties, he would lose the assets of the IRA to the Appellee and have to pay the taxes and tax penalties on the IRA out-of-pocket with future earnings, if he can. This is the potentially absurd result, and it underscores why it makes sense to wait for a final, non-appealable determination by the IRS or a Tax Court before subjecting IRA assets to administration by creditors or trustees.

## IV.   The Bankruptcy Court Order Is Not from the IRS Nor a Tax Court and the Decision Cannot Be Both Subsequent and Prior to the Petition Date.

Appellee admits that the facts and circumstances as of the Petition Date govern whether the IRA qualifies for an exemption. (Answer Brief at p. 23). Appellee does not contest the fact that as of the Petition Date, no subsequent, final, and non-appealable determination had been made. Nor does Appellee contest the fact that as of the Petition Date neither the IRS nor

15

a Tax Court have made any determination regarding the IRA.  The obvious conclusion from these facts is that while the IRA is not exempt from creditors under 11 U.S.C. § 522(b)(3)(C) because the Bankruptcy Court found the IRA to have lost its tax-exempt status in 2014, the IRA is exempt from creditors under § 222.21, *Florida Statutes*, because, as of the Petition Date no determination had yet been made, by any arbiter for that matter. Since the Petition Date controls, and no final, non-appealable determination existed on the Petition Date, the IRA is therefore exempt.

Appellee argues instead that the later, post-Petition Date determination by the Bankruptcy Court that the IRA had lost its tax-exempt status should be retroactively effective *nunc pro tunc* as of the Petition Date. (Answer Brief at p. 23).  According to Appellee, at the time of the Petition Date there did exist, in fact, a subsequent, final, and non-appealable order, even though it was entered long after the Petition Date, and is still not final and non-appealable.  This is circular reasoning.

In support of this argument, Appellee cites to *In re Helsel, Sr.*, 326 B.R. 591, 602 (Bankr. W.D. Pa. 2005).  *Helsel*, however, only states that when reviewing exemptions, a bankruptcy court should look at a "retroactive snapshot" of the facts and circumstances as of the petition date. *Id.*

Appellant agrees with the ruling in *Helsel*, and Appellant further argues that a ruling denying an exemption due to facts and circumstances existing as of the petition date is a final *declaration*, in fact a present declaration, that the asset in question is not exempt because of the facts existing as of the petition date.  There is no limbo period as suggested by Appellee (Answer Brief, fn. 2).  Either something is exempt as of the petition date and therefore exempt for the rest of the case, or it is not, and later events, facts, and circumstances are irrelevant.  *See Matter of Rivera*, 5 B.R. 313, 315 (Bankr. M.D. Fla. 1980).

Appellee's argument, which is not found in any of the case law cited in the Answer Brief, is that a post-petition ruling by a bankruptcy court on an exemptions issue can travel back in time and become a pre-petition final ruling sufficient to make an asset that was originally exempt on the petition date into an asset that is no longer exempt.  To be even more precise, under Appellee's circuitous logic, the exemption would only be fully denied when this appeal is resolved and the Bankruptcy Court's order becomes non-appealable, at which point the order would then, at that future date, travel back to the Petition Date.  This is semantics, not logic.

17

There is only one set of facts and circumstances existing as of the Petition Date.   As of the Petition Date, no final and non-appealable determination of any kind had been made by any arbiter that the IRA had lost its tax-exempt status.   While the Bankruptcy Court was empowered to make a post-Petition Date determination that the IRA had lost its tax-exempt status pursuant to 11 U.S.C. § 522(b)(3)(C) and *In re Willis*, 424 Fed. Appx. 880, 880 (11th Cir. 2011), that post-Petition Date determination is irrelevant to § 222.21, *Florida Statutes*, which makes IRAs exempt from creditors until a subsequent, final, and non-appealable order is entered, which did not exist on the Petition Date and does not exist now.

This underscores the policy intended by the Florida Legislature.   IRA accounts, even those that eventually lose their tax-exempt status due to undisputed disqualifying transactions, are nevertheless exempt from creditors until a later ruling is final and non-appealable.   While this may seem unfair to creditors in many situation, the Florida Legislature made this policy decision to increase protection of debtors at the expense of creditors. It did this by creating additional procedural conditions which must be met before creditors are permitted to levy upon IRA accounts.   It intentionally made it impossible for creditors to collect from IRA accounts even when the

18

IRA Account will eventually lose its tax-exempt status until that status is lost per a final and non-appealable order.

This policy decision, although friendly to debtors, removed the situation where a creditor could ask a court to declare an IRA account of its debtor to have lost tax-exempt status and then take all the assets in the account leaving the debtor with a massive tax bill, which tax bill should logically be paid from those same assets.  Instead, the Florida Legislature altered the law in 2005 to require creditors to wait until there is a final, non-appealable ruling, let the IRS take its penalties from the fund, and then permit the creditor to proceed on what's left.  This policy decision is thoughtful, logical, and Constitutional, and serves to protect Appellant's IRA from administration by the Trustee of his estate and serves to preserve the assets of the IRA for payment to the IRS.  For these reasons, the ruling of the Bankruptcy Court should be overturned and the IRA declared exempt.

**DATED** this 12th day of September, 2017.

Respectfully submitted,

*/s/ Michael A. Nardella*
Michael A. Nardella, Esq.
Florida Bar No.: 51265
Christian S. Graham, Esq.
Florida Bar No.: 94245
Nardella & Nardella, PLLC

19

250 E. Colonial Dr., Suite 102
Orlando, Florida 32801
Telephone (407) 966-2680
mnardella@nardellalaw.com
cgraham@nardellalaw.com
Attorneys for Appellant

20

## <u>CERTIFICATE OF COMPLIANCE</u>

**I HEREBY CERTIFY** that Appellant's Reply Brief complies with

the type volume limitations set forth in Rule 8015(a)(7)(B). The Microsoft

Word word check tool identifies 4,661 words and 589 lines of text within the

Reply Brief, including headings, footnotes, and quotations.

**NARDELLA & NARDELLA, PLLC**

*/s/ Michael A. Nardella*
Michael A. Nardella, Esq.
Florida Bar No.: 51265
Christian S. Graham, Esq.
Florida Bar No.: 94245
**Nardella & Nardella, PLLC**
250 E. Colonial Dr., Suite 102
Orlando, Florida 32801
Telephone (407) 966-2680
mnardella@nardellalaw.com
cgraham@nardellalaw.com
Attorneys for Appellant

21

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:                                          Bkr Case No. 6:15-BK-1720-KSJ

**KEITH A. YERIAN,**

**Debtor.**

_____/

**KEITH A. YERIAN.**
                                                **Case No. 6:17-CV-459-Orl-31**
**Appellant,**

**v.**

**RICHARD  B.  WEBBER,  II,  as
TRUSTEE,**

**Appellee.**

_____/

## Certificate of Service

I HEREBY CERTIFY that a true copy of **THE REPLY BRIEF OF APPELLANT KEITH A. YERIAN** has been furnished by facsimile, electronic transmission and/or U.S. Mail, postage prepaid to the following: Richard B. Webber, II, Esq., as Trustee, Bradley J. Anderson, Esq., and Kevin Robinson, Esq., Zimmerman, Kiser & Sutcliffe, P.A., 315 East Robinson Street, Suite 600, Orlando, FL 32801, this 12th day of September, 2017.

_Michael A. Nardella_
Michael A. Nardella, Esquire

22